**CAROLIN CORPORATION,**
Plaintiff–Appellant,

v.

**Robert J. MILLER, Jr.,**
Defendant–Appellee.

No. 88–1545.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 6, 1988.
Decided Sept. 28, 1989.

Widener, Circuit Judge, filed dissenting opinion.

David Farrer Meschan (Harold A. Lloyd, Tuggle, Duggins, Meschan & Elrod, P.A., Greensboro, N.C., on brief), for plaintiff-appellant.

Bonnie Kay Donahue (Charles M. Ivey, III, Greensboro, N.C. and Robert L. McClellan, Summerfield, N.C., Ivey, Ivey & Donahue, Greensboro, N.C., on brief), for defendant-appellee.

Before ERVIN, Chief Judge, and WIDENER and PHILLIPS, Circuit Judges.

PHILLIPS, Circuit Judge:

This appeal requires us first to decide whether and, if so, by what standard, a bankruptcy court may dismiss a voluntary Chapter 11 bankruptcy petition at the very outset because it was not filed "in good faith." It then requires us to decide whether the petition here in issue was properly dismissed for that reason.

On the first issue we hold that a bankruptcy court may dismiss such a petition for want of good faith in its filing, but only with great caution and upon supportable findings both of the objective futility of any possible reorganization and the subjective bad faith of the petitioner in invoking this form of bankruptcy protection. On the second issue, on Carolin Corporation's appeal from the district court's affirmance of the bankruptcy court's dismissal of the original Chapter 11 petition for lack of good faith, we find no error and affirm.

## I

This case sounds in bankruptcy, but it is fundamentally a dispute over the fate of valuable property. Carolin Corporation (Carolin) is a real estate holding company. Its principal assets are a 5.66–acre parcel of land located in Lexington, North Carolina, and the 80,000 square foot industrial building situated thereon. Robert J. Miller, Jr. is Carolin's only secured creditor. He is the successor beneficiary of a purchase money deed of trust on the Lexington property and successor payee under the $650,000 purchase money promissory note which Carolin executed to finance its original purchase of the land and building.

Carolin defaulted on the note in the summer of 1986. On December 3, 1986—fifty minutes before a scheduled foreclosure sale under the deed of trust—the company filed for Chapter 11 protection. The filing automatically stayed foreclosure, 11 U.S.C. § 362(a), triggering the present dispute between Carolin and Miller over the company's ultimate eligibility for protection under the bankruptcy statutes. The history of this case is far more extensive and intricate than our simple recitation would imply, however, and we therefore begin with events predating Carolin's Chapter 11 filing by nearly four years.

On March 7, 1983, Steve and Linda Pitchersky purchased the Lexington property from the Miller Tool Company, a family business then managed by Mr. Miller's mother, Nancy P. Miller. The Pitcherskys financed the transaction by executing a promissory note and purchase money deed of trust in favor of Miller Tool. They operated New Age Furniture Industries, Inc. on the property until late 1984, but ultimately defaulted on the note when the business failed. Miller Tool foreclosed on the deed of trust and repurchased the property at a foreclosure sale on December 19, 1984.

On January 14, 1985, Carolin purchased the Lexington property from Miller Tool, financing the transaction with the promissory note and deed of trust that are the subject of the present dispute. The note bears interest at ten percent per annum and provides for the payment of interest only for the first thirty-nine months, followed by monthly payments of principal and interest on a twenty-five year amortization schedule. All remaining principal and interest is due in May of 1993 in a balloon payment.

When it purchased the Lexington property, Carolin also acquired at public auction all of New Age's tangible assets, including various machinery and equipment. At the time of these transactions, Edwin Goldstein, then the President of Carolin, and Misoslav Arandjelovic, then the owner of the JMC Furniture Company, Inc., owned all of Carolin's stock. Shortly after Carolin completed its purchases, it leased the property to JMC for a twenty-year term beginning in January of 1985. After JMC took possession under the lease, two fires of undetermined origin occurred at the site— the first sometime in June of 1985, and the second on April 7, 1986. The fires caused extensive damage to approximately 20,000 square feet of the building. JMC received approximately $150,000 in insurance proceeds after the first fire, which funds it apparently transferred to Carolin. Mrs. Miller ultimately received other fire insurance proceeds, the application of which is disputed by the parties. The building underwent minor repairs after the first fire; no repairs were made following the second fire. Part of the building still does not have a roof.

In the summer of 1986, JMC encountered financial difficulties and defaulted on its lease of the Lexington property. On November 5, 1986, Carolin, JMC, Goldstein and Arandjelovic entered into an agreement for the termination of the lease. At the same time, Arandjelovic transferred his interests in Carolin to Goldstein, who thus became the owner of all Carolin stock. Having no substitute tenant and no remaining source of income, Carolin soon defaulted on its promissory note, which had been assigned (together with the deed of trust) by Miller Tool to Mrs. Miller in June of 1985.

In an attempt to foreclose on the deed of trust, Mrs. Miller arranged for a fore-

closure sale of the Lexington property. On December 2, 1986, the day before the scheduled sale, Steve and Linda Pitchersky—the prior owners of the property—reentered the scene. Together with Dale Cline and David Zagerolli, they incorporated the Benz Holding Company and purchased all of its stock. On December 3, 1986, Benz acquired all of Carolin's stock from Goldstein. Then, less than an hour before the foreclosure sale was scheduled to occur, Benz' principals caused Carolin to file its Chapter 11 petition.

The following day, Mrs. Miller filed a motion in the bankruptcy court seeking, *inter alia,* relief from the automatic stay, adequate protection, conversion of the case to Chapter 7 or, in the alternative, dismissal of Carolin's Chapter 11 petition. On February 10–11 and February 23, 1987, the bankruptcy court held extensive hearings and heard argument directed to only one of the questions raised by Mrs. Miller's motion: whether Carolin's petition should have been dismissed for failure to file in good faith.

While the bankruptcy court considered the motion, Arandjelovic reappeared.[1] On April 15, 1987, he and Mrs. Miller executed a "Purchase Agreement," under the terms of which Arandjelovic would acquire the Lexington property if Mrs. Miller ultimately repurchased the tract at a foreclosure sale or succeeded in obtaining a deed in lieu of foreclosure. The Purchase Agreement is apparently still operative.

On April 24, 1987, the bankruptcy court entered an order dismissing Carolin's Chapter 11 case for "lack of good faith in filing the petition." *In re Carolin Corp.,* No. B–86–02443C–11, slip op. at 1 (Bankr.M.D. N.C. Apr. 24, 1987). The court noted the presence of "a number of factors suggest[ing] that [Carolin's] bankruptcy filing was not in good faith." *Id.* at 6. The

court found, for example, that Carolin's case "fit squarely into the 'new debtor syndrome,' " *id.* at 7, "in which a one-asset entity has been created or revitalized on the eve of foreclosure to isolate ... insolvent property and its creditors." *Id.* at 6 (quoting *In re Little Creek Development Co.,* 779 F.2d 1068, 1073 (5th Cir.1986)). The court also noted the presence in Carolin's case of a number of the other "indicia" of bad faith filings recognized by the *Little Creek* court. There were no substantial secured or unsecured claims on Carolin's assets (other than Mrs. Miller's claim on the Lexington property). *Id.* at 9. There was, in the court's eyes, only a slim chance that Carolin might find a new tenant or other new source of substantial income. *Id.* at 8. Carolin had only one employee, who knew little about the business. *Id.* at 9. Benz' principals had a "prior history of ... default and foreclosure on the same property with the same secured creditor." *Id.* at 10. The new owners had, moreover, "careful[ly] ... minimize[d] their investment" in Carolin, suggesting little if any bona fide intent to rehabilitate the business. *Id.* at 8–9.

The court concluded that the Benz principals had formed the holding company and caused Carolin to file its Chapter 11 petition for the purpose of acquiring the Lexington property without paying a fair market price at the imminent foreclosure sale, while preserving the existing financing on the property. *Id.* at 8. The court therefore dismissed the case, on the general grounds that "the investors in Carolin are attempting to pervert the bankruptcy process by using the system to maximize an investment opportunity and minimize the investors' risk at the expense of the secured creditor," without any "legitimate purpose of reorganization." *Id.* at 4–5.

Carolin appealed to the district court and filed a motion in the bankruptcy court seek-

---

**1.** It might be more accurate to say that Arandjelovic (and JMC) never left. Notwithstanding the November 5, 1986, agreement between Carolin, JMC, Goldstein and Arandjelovic (discussed *ante* ), JMC apparently failed to vacate the Lexington premises. In connection with the Chapter 11 proceedings which are the subject of this case, Carolin instituted an adversary proceeding

seeking the ejectment of JMC from the property. The bankruptcy court dismissed the adversary proceeding immediately after it dismissed Carolin's Chapter 11 petition. *In re JMC Furniture Co./In re Carolin Corp.,* Adversary Proceeding No. A–86–0239 (Bankr.M.D.N.C. Apr. 24, 1987) ("Order of Dismissal"). JMC is not now in possession of the premises.

ing a stay of the dismissal order and temporary reinstatement of the Chapter 11 case pending resolution of the appeal. On May 18, 1987, the bankruptcy court entered an order conditionally granting the motion but requiring Carolin, pending a final order from the district court: (1) to tender to Mrs. Miller "adequate protection" payments on the promissory note of $5,000 per month; (2) to pay into an escrow account amounts sufficient to satisfy all *ad valorem* taxes on the Lexington property; (3) to provide fully paid fire insurance on the property, naming Mrs. Miller as loss-payee to the extent of her interests; and (4) to post a supersedeas bond of $250,000 to protect Mrs. Miller against "all costs and damages that [the] Court might determine that [she] has suffered for further delay as a result of the stay provided for herein if the Debtor's appeal is dismissed or the Dismissal Order is finally affirmed." *See In re Carolin Corp.*, No. B–86–02443C–11, slip op. at 2–3 (Bankr.M.D.N.C. May 18, 1987) ("Order Allowing Debtor's Motion for Stay Pending Appeal"). On May 28, 1987, the bankruptcy court entered an order finding that Carolin had complied in timely fashion with the conditions of the May 18 stay order.

On appeal to the district court, Carolin pressed several general objections to the bankruptcy court's determination that Carolin lacked good faith in seeking the protection of the bankruptcy statutes and to the attendant dismissal of its Chapter 11

petition. Carolin also argued that the bankruptcy court's order staying dismissal of the case pending appeal effectively "mooted" the question of whether the Chapter 11 petition had been filed in good faith, requiring reversal and remand for further proceedings in bankruptcy. Carolin argued that its compliance with the stay order showed, contrary to the bankruptcy court's ultimate findings, that the company had an ability and willingness both to provide for "adequate protection" of Mrs. Miller's interests and, as a general matter, to reorganize successfully. Carolin pointed out that the Benz principals had advanced sufficient funds to Carolin to facilitate compliance with the conditions of the stay order and had procured personal lines of credit totalling $300,000 for use in the Chapter 11 reorganization. The company also claimed to have a prospective new tenant for the Lexington property and sufficient funds available to complete repairs on the building. Together, Carolin argued, these "subsequent developments" and the company's stipulated compliance with the protective conditions of the stay order dispositively undermined the factual bases of the bankruptcy court's findings.

The district court rejected Carolin's claims and affirmed the dismissal of the company's Chapter 11 petition. *Carolin Corp. v. Miller*, No. C–87–477–G, slip op. at 4–12 (M.D.N.C. Jan. 15, 1988). Carolin then appealed to this court on February 16, 1988.[2]

---

2. Pending the appeal, there have been a number of developments that, while not technically relevant to the principal issue on appeal, are important in assessing the general setting in which the challenged dismissal occurred. All these developments are properly before us in various motion papers filed pending resolution of the appeal.

On May 7, 1988, Mrs. Miller died. On August 1, 1988, this court granted a motion to substitute her son, Robert J. Miller, Jr., as the proper party-in-interest and appellee in the case. Then, shortly before the parties appeared before us on October 6, 1988 for oral argument, we were advised that Mrs. Miller's death had brought the bankruptcy court back into the fray. Beginning in June of 1988, Carolin had ceased making the payments required by the bankruptcy court's stay order. Carolin claimed that it was entitled to withhold all payments because the stay order by its terms required payment to Mrs. Miller.

The company argued that, after Mrs. Miller's death, it was unclear whether her estate or some other party or entity was the proper continuing payee under the order. In September of 1988, counsel for Mrs. Miller filed a motion in the bankruptcy court seeking substitution of Robert J. Miller, Jr. as the proper party-in-interest under the stay order. The motion also sought an order compelling Carolin to tender to Mr. Miller all accrued amounts payable in connection with the conditions of the stay order. Carolin filed a cross-motion seeking modification of the stay order or, in the alternative, a moratorium on its obligation to make continuing payments.

Relying on our earlier substitution of Mr. Miller as the proper appellee in this case, the bankruptcy court granted Miller's motion on September 7, 1988. The court ordered Carolin to cure all arrearages in payments due under the stay order by September 15, 1988. On September 30, 1988, after further maneuvering by

## II

We have not before had occasion to consider whether a bankruptcy court may properly dismiss a Chapter 11 petition for want of good faith on the debtor's part, nor if so, under what standards. A "good faith filing" requirement applicable to Chapter 11 cases is not to be found in the bankruptcy code itself. Despite the lack of express authorization in the statutes, however, courts presented with the question have uniformly held that, "generally, an implicit prerequisite to the right to file [a Chapter 11 petition] is 'good faith' on the part of the debtor, the absence of which may constitute cause for dismissal...." *In re Winshall Settlor's Trust*, 758 F.2d 1136, 1137 (6th Cir.1985). *See generally* 2 L. King, *Collier on Bankruptcy* § 301.05[1], at 301–6 to 301–7 & n. 2a (15th ed. 1979) (discussing cases holding that "the debtor must commence the case in 'good faith' for purposes that reflect the intended policies of the Code," and noting that the " 'good faith' requirement ... arises purely from judicial interpretation").

We agree with the other courts that have so held and conclude that a good faith filing requirement is implicit in several specific provisions of the bankruptcy code, interpreted in light of established policy considerations underlying the code's provision of bankruptcy protection. As the Fifth Circuit recently recognized, a good faith requirement

> prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefiting them in any way or to achieve reprehensible purposes. Moreover, a good faith standard protects the jurisdictional integrity of the bankruptcy courts by rendering their powerful equitable weapons

(i.e., avoidance of liens, discharge of debts, marshalling and turnover of assets) available only to those debtors and creditors with "clean hands."

*In re Little Creek Development Co.*, 779 F.2d 1068, 1072 (5th Cir.1986). It provides a means for inquiring at the outset into the critical question of whether there is indeed a "going concern to preserve," *Id.* at 1073, by requiring that the petitioner establish to the court's satisfaction that there exists the "realistic possibility of an effective reorganization." *In re Albany Partners, Ltd.*, 749 F.2d 670, 674 (11th Cir.1984). It is of course obvious that "if there is not a potentially viable business in place worthy of protection and rehabilitation, the Chapter 11 effort has lost its *raison d'etre*...." *Winshall*, 758 F.2d at 1137 (quoting *In re Ironsides, Inc.*, 34 B.R. 337, 339 (Bankr.W. D.Ky.1983)), and the ability of bankruptcy courts to inquire into that critical matter at the very threshold would seem indispensable to proper accomplishment of the basic purposes of Chapter 11 protection.

Justification for finding such a power in the code is not, however, dependent solely upon such broad policy considerations. Several specific provisions of the code itself and of the bankruptcy rules imply such a power as a necessary incident to carrying out those provisions.

Section 1112(b) of the Code provides that "the [bankruptcy] court may convert a case under [Chapter 11] to a case under [C]hapter 7 of this title *or may dismiss a case under [Chapter 11]*, whichever is in the best interest of creditors and the estate, *for cause*...." 11 U.S.C. § 1112(b) (emphasis supplied). The provision then sets out a non-exhaustive list of circumstances in which conversion or dismissal might be appropriate, including the manifest absence

---

both parties, the bankruptcy court entered an order finding that Carolin had failed to make the payments required under either the stay order or the court's September 7 modification and compliance order. The court dissolved the original stay order, thereby permitting foreclosure of the Lexington property to go forward.

Mr. Miller subsequently arranged for a third attempted foreclosure sale, which was scheduled for November 18, 1988. Renewing its claims with respect to the ongoing validity of the lower court's original stay order, Carolin then filed a motion in this court seeking a stay of foreclosure pending our final decision. Of course, these claims bordered on the frivolous, in light of Carolin's continued unwillingness (or inability) to make the payments required by the original stay order and the fact that we had long before settled the "proper party-in-interest" question. We denied Carolin's motion on November 15, 1988, thereby permitting the foreclosure sale to proceed.

of a "reasonable likelihood of rehabilitation," the debtor's apparent "inability to effectuate a plan [of reorganization]," or an "unreasonable delay by the debtor that is prejudicial to creditors." *Id.* §§ 1112(b)(1)–(3).

For three distinct reasons, a generalized "good faith filing" requirement appears implicit in § 1112(b). First, the provision lists *objective* circumstances which presumably justify dismissal because they suggest the futility of reorganization proceedings. Second, and more significantly, the listed circumstances are generally consistent with and may in fact affirmatively evidence a *subjective* lack of good faith on the part of a Chapter 11 petitioner. Finally, of course, § 1112(b) permits dismissal not only in the enumerated circumstances but, more generally, "for cause," further suggesting the propriety of dismissal in the face of a petitioner's lack of good faith. As the pertinent legislative history puts it, "[t]he list is not exhaustive. The court will be able to consider other factors as they arise, and to use its equitable powers to reach an appropriate result in individual cases." H.R. Rep. No. 595, 95th Cong., 2d Sess. 406, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5963, 6362.

We agree, then, that the broad language of § 1112(b) "supports the construction that a debtor's lack of 'good faith' may constitute cause for dismissal of a petition." *Albany Partners*, 749 F.2d at 674. *See also Little Creek*, 779 F.2d at 1072 (lack of good faith constitutes "cause" for dismissal under § 1112(b)); *Winshall*, 758 F.2d at 1137 (good faith is "implicit prerequisite to the right to file ..., the absence of which may constitute cause for dismissal under § 1112(b)").

The code's provision governing relief from the "automatic stay," 11 U.S.C. § 362(a), also suggests a bankruptcy court's authority to dismiss a Chapter 11 petition for want of good faith.

On the request of a party in interest and after notice and a hearing, the [bankruptcy] court shall grant relief from the stay provided under [§ 362(a)], such as by terminating, annulling, modifying, or

conditioning such stay ... [,] for cause, including the lack of adequate protection of an interest in property of such party in interest.

11 U.S.C. § 362(d)(1) (emphasis supplied). Just as § 1112(b) inferentially permits inquiry into a debtor's good faith in the context of an interested party's motion to dismiss, § 362(d)(1)'s "for cause" language authorizes the court to determine whether, with respect to the interests of a creditor seeking relief, a debtor has sought the protection of the automatic stay in good faith. In a case akin to Carolin's, where a debtor has but one significant asset and a single creditor has a secured claim against that asset, "for cause" relief from the stay in favor of such a creditor would normally entail dismissal in short order of the entire case. In such circumstances, therefore, the statute inferentially permits inquiry into the debtor's good faith in commencing the case as a whole. *See* 2 L. King, *Collier on Bankruptcy* § 362.07[3], at 362–64 (15th ed. 1979) ("In extreme cases a finding that the bankruptcy case was not commenced in good faith has been used as a basis for vacating or annulling the automatic stay [under § 362(d)(1)].") (citing *Little Creek* and *Albany Partners*).

Finally, certain rules of practice and procedure in the bankruptcy courts bear out the power implicit in the code. The bankruptcy counterpart to Fed.R.Civ.P. 11 provides, in relevant part:

Every petition, pleading, motion and other paper served or filed in a case under the [Bankruptcy] Code on behalf of a party ... shall be signed by at least one attorney of record [or by the party, if the party is not represented by an attorney].... The signature of an attorney or a party constitutes a certificate that the attorney or party has read the document; that to the best of the attorney's or party's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; and that it is not interposed for any improper purpose,

such as to harass, to cause delay, or to increase the cost of litigation.

Bankr. Rule 9011(a). We believe that, like Rule 11, which employs substantially similar language, Rule 9011 is meant to "discourage dilatory or abusive tactics and help to streamline the litigation process by lessening frivolous claims...." Notes of Advisory Committee on Rules, 1983 Amendments, Fed.R.Civ.P. 11. *See generally* 5 C. Wright & A. Miller, *Federal Practice and Procedure* §§ 1131–35 (1969). In turn, Rule 9011 necessarily implies that all bankruptcy pleadings, including Chapter 11 petitions, must be filed in good faith.

On the basis of the soundly reasoned decisions of other courts, the clear purposes of the bankruptcy code and our reading of the relevant statutory provisions and rules, we hold that petitions for protection under the reorganization provisions of Chapter 11 must be filed in "good faith." If properly found not to have been, they may be summarily dismissed for that reason.

### III

■ The next question is that of the standards by which a bankruptcy court properly may determine that a filing is not in good faith and hence subject to dismissal at the threshold. We begin consideration of this question by observing that this power, while essential to proper administration of Code policies and implicit in the statute itself, is obviously one to be exercised with great care and caution. Decisions denying access at the very portals of bankruptcy, before an ongoing proceeding has even begun to develop the total shape of the debtor's situation, are inherently drastic and not lightly to be made. Considering dismissal at this point, a court must keep in mind that

> [c]reditors who become entangled in hopeless Chapter 11 cases ... have remedies of relief from stay, adequate protection, and dismissal or conversion based on the enumerated grounds in 11 U.S.C. § 1112(b). Dismissal on grounds of bad faith filing should not be judicially [employed] as an easy alternative to other

post-petition creditor remedies, thereby[ ] subverting the reorganization and confirmation scheme of the Code.

*In re Mill Place Ltd. Partnership*, 94 B.R. 139, 141 (Bankr.D.Minn.1988).

This suggests that something more than even the most obvious likelihood of ultimate futility should be required to justify threshold dismissals for want of good faith in filing. The something more, as generally recognized, is subjective bad faith on the part of the petitioner.

Some courts require that *both* objective futility and subjective bad faith be evident. *See, e.g., Little Creek*, 779 F.2d at 1072 (bankruptcy courts must conduct "on-the-spot evaluation of the debtor's financial condition, motives, and the local financial realities"); *Albany Partners*, 749 F.2d at 674 (dismissal warranted when "there is no realistic possibility of an effective reorganization and it is evident that the debtor seeks merely to delay or frustrate"). Other courts apparently hold that threshold dismissal may be warranted when either futility or bad faith is then evident. *See, e.g., In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393, 1395 (11th Cir.1988) ("the possibility of a successful reorganization cannot transform a bad faith filing into one undertaken in good faith."); *In re North Redington Beach Assoc.*, 91 B.R. 166, 169 (Bankr.M.D.Fla.1988) (good faith requires "presence of honest intention ... and some real need and real ability to effectuate the aim of the reorganization"); *In re Oakgrove Village, Ltd.*, 90 B.R. 246, 249 (Bankr. W.D.Tex.1988) (dismissal warranted when either bad faith or futility apparent); *In re Markunes*, 78 B.R. 875, 880 (Bankr.S.D.Ohio 1987) (good faith involves "debtor's honest intention in filing as well as the need and realistic ability to effectuate a reorganization"); *In re McDermott*, 78 B.R. 646, 651 (Bankr.N.D.N.Y.1985) ("Good faith requires an intent to reorganize accompanied by a reasonable possibility of success; honesty and good intentions are not sufficient."). Upon consideration, we agree with those courts that require that *both* objective futility and subjective bad faith be shown in order to warrant

dismissals for want of good faith in filing. This means that if the only question raised is whether a reorganization is realistically possible, i.e., if there is no question of the petitioner's subjective good faith in filing, threshold dismissal of a petition is not warranted. In those circumstances the question of ultimate futility is better left to post-petition developments. By the same token, even if subjective bad faith in filing could properly be found, dismissal is not warranted if futility cannot also be found.

This, we think, is the only sufficiently stringent test of justification for threshold denials of Chapter 11 relief. Such a test obviously contemplates that it is better to risk proceeding with a wrongly motivated invocation of Chapter 11 protections whose futility is not immediately manifest than to risk cutting off even a remote chance that a reorganization effort so motivated might nevertheless yield a successful rehabilitation. Just as obviously, it contemplates that it is better to risk the wastefulness of a probably futile but good faith effort to reorganize than it is to risk error in pre-judging its futility at the threshold. We believe that such a stringent test is necessary to accommodate the various and conflicting interests of debtors, creditors, and the courts that are at stake in deciding whether to deny threshold access to Chapter 11 proceedings for want of good faith in filing.

We turn now to the specific objects of the required two-pronged inquiry and to the evidence required to establish each. At the outset we note that though separate inquiries into each are required, proof inevitably will overlap. Evidence of subjective bad faith in filing may tend to prove objective futility, and *vice versa*. Indeed it could be that some of the courts ostensibly holding that dismissal is warranted upon a finding of either have considered that proof

of either implicitly proves both.[3] *See ante,* p. 700. We also note preliminarily that despite widespread judicial acceptance and application of the good faith filing requirement, no generally accepted proof requirements have emerged. *See In re Victory Constr. Co.,* 42 B.R. 145, 149 (Bankr.C.D. Cal.1984) (*Victory IV*) (deploring absence of guiding principles). Instead, courts have relied upon various "indicia" and "recurring patterns" of conduct thought to suggest either or both subjective bad faith and/or objective futility. *See, e.g., Little Creek,* 779 F.2d at 1072–73.

The dangers of overemphasis on particular indicia or patterns, of engaging in mere indicia-counting, and of forcing particular facts into previously identified patterns is obvious, and must be guarded against. We simply note, as have other courts, that a totality of circumstances inquiry is required; that "any conceivable list of factors is not exhaustive"; and that there is no "single factor that will necessarily lead to a finding of bad faith." *In re Natural Land Corp.,* 825 F.2d 296, 298 (11th Cir.1987). *See also In re American Property Corp.,* 44 B.R. 180, 182 (Bankr.M. D.Fla.1988) ("no one factor ... determinative of good faith").

The overall aim of the twin-pronged inquiry must of course be to determine whether the purposes of the Code would be furthered by permitting the Chapter 11 petitioner to proceed past filing.

The objective futility inquiry is designed to insure that there is embodied in the petition "some relation to the statutory objective of resuscitating a financially troubled [debtor]." *In re Coastal Cable TV, Inc.,* 709 F.2d 762, 765 (1st Cir.1983). It should therefore concentrate on assessing whether "there is no going concern to preserve ... and ... no hope of rehabilitation, except according to the debtor's 'terminal

---

**3.** We do not rule out the possibility that in a given case proof of the objective futility of a proposed reorganization might be so overwhelming that it would support a parallel finding of subjective bad faith despite the lack of any other evidence more directly probative of the petitioner's motive. In some situations futility may be so obvious that the only rational

inference to be drawn is that petitioner had to be aware of it, hence not to have intended to reorganize but only to delay or harass. Even so, to insure disciplined application of the test and maintain its stringency, bankruptcy courts should make and report findings as to both futility and bad faith notwithstanding the same evidence is thought to establish both.

euphoria.' " *Little Creek,* 779 F.2d at 1073.

■ The subjective bad faith inquiry is designed to insure that the petitioner actually intends "to use the provisions of Chapter 11 ... to reorganize or rehabilitate an existing enterprise, or to preserve going concern values of a viable or existing business." *In re Victory Constr. Co.,* 9 B.R. 549, 564 (Bankr.C.D.Cal.1981) (*Victory I*). Put obversely, its aim is to determine whether the petitioner's real motivation is "to abuse the reorganization process" and "to cause hardship or to delay creditors by resort to the Chapter 11 device merely for the purpose of invoking the automatic stay, without an intent or ability to reorganize his financial activities." *In re Thirtieth Place, Inc.,* 30 B.R. 503, 505 (9th Cir.Bankr. App.1983).

### IV

■ It remains to assess the propriety of the district court's dismissal of the petition here for want of good faith in filing. We review the bankruptcy court's ultimate finding that the filing was not in good faith as one of fact subject to the clearly erroneous standard. *See, e.g., Little Creek,* 779 F.2d at 1073–74; *In re Holi–Penn, Inc.,* 535 F.2d 841, 844–45 (3d Cir.1976); *In re Bolton Hall Nursing Home,* 432 F.Supp. 528, 532 (D.Mass.1977).

■ Here, the bankruptcy court conducted a searching inquiry into the question of Carolin's good faith in filing its Chapter 11 petition. Following a series of hearings confined solely to that question, in which it heard extensive testimony and received voluminous documentary evidence, the court determined that the filing was not in good faith. While not, of course, specifically framed in terms of the two-part test which we have suggested as appropriate for conducting the good faith inquiry, we are satisfied that reviewed under that test the court's ultimate finding was not clearly erroneous and must be affirmed.

### A

There is little if any evidence in the record to suggest that, at the time the bankruptcy court entered its dismissal order, Carolin showed significant potential ultimately to emerge from Chapter 11 proceedings in a rehabilitated condition—that is, ready to carry on with viable business operations. Carolin produced a "letter of intent" from Contemporary Shells, Inc., a New York company, "stating that [Contemporary Shells] was interested in a lease [on the Lexington property] and generally defining ... agreed upon rental payments." *In re Carolin Corp.,* No. B–86–02443C–11, slip op. at 8 (Bankr.M.D.N.C. Apr. 24, 1987). The bankruptcy court, however, "consider[ed] the proposed arrangement for future occupancy to be tenuous," *id.,* and we note that in numerous supplementations of the record in this case Carolin has never suggested either that (after nearly two years during which both opportunity and incentive remained) the Contemporary Shells arrangement actually materialized, or that Carolin ever secured an agreement with any other tenant for the Lexington property. In any event, and in the absence of any suggestion to the contrary, we accept the bankruptcy court's first-hand impression of the tenuousness of Carolin's "arrangements" for securing new tenants and an ongoing source of income.

Even apart from the flimsiness of Carolin's claims with respect to the immediate prospects for new rental income, there is abundant direct evidence in this record to support the court's ultimate finding that Carolin had no realistic chance to rehabilitate its business successfully. One could hardly expect that prospective tenants would consider the fire-damaged Lexington property—which none of the parties seemed ready, willing, or able to repair—an attractive location for their businesses. More significantly, it appeared (and still appears) that the Benz principals were unwilling to infuse Carolin with any significant new funds for operating or capital needs either during Chapter 11 reorganization or thereafter. Benz did in fact provide Carolin with some funding, *id.* at 9, but its posture during the initial Chapter 11 pro-

ceedings and at hearings on Miller's dismissal motion suggests that it was disposed (or able) to go only so far. When the bankruptcy court pursued Mrs. Miller's initial request for "adequate protection" payments pending proposal and confirmation of a reorganization plan, counsel for Carolin apparently claimed that such payments could only be made to the extent of Carolin's prospective receipt of use and occupancy payments from JMC, which at the time was still occupying the Lexington building. Yet all the while, Carolin was pursuing an adversary proceeding to eject JMC from the premises summarily,[4] which if successful would have resulted in elimination of the source of funds that Carolin claimed was all it had available to give adequate protection to its creditors. *See id.* at 8. Here, of course, Carolin blew hot and cold. It claimed that it was capable of successfully reorganizing, but also sought to eliminate what it said was the sole financial means of effectuating a central feature of the process of reorganization. We think the bankruptcy court quite reasonably concluded that, at least with respect to Carolin's ability to facilitate Chapter 11 proceedings by providing adequate protection to creditors, the Benz principals displayed little willingness to contribute to the immediate or ongoing rehabilitation of the business.

In many other respects, the evidence suggested that there was not actually an ongoing business to protect, and that Carolin was more akin to a shell corporation than a viable enterprise. The company had only one employee, Edward Eldredge, who "knew little about the business, was hired on a consultant basis as a property manager," and "did not make decisions." *Id.* at 9. Carolin had no significant assets apart from the Lexington property, and no unsecured creditors with substantial claims, the presence of which would have suggested ongoing business relationships. In fact, there is simply nothing in the record to suggest that, at any relevant time, Carolin was conducting or *could* conduct business activities of any kind.

Under the circumstances suggested by the bankruptcy court's findings, which we see no grounds for questioning, Carolin had nothing but a remotely speculative chance of successful Chapter 11 reorganization. We conclude, therefore, that the findings below satisfied the "objective" prong of the two-part test for ascertaining whether Chapter 11 petitions have been filed in good faith.

### B

We also find abundant direct and circumstantial evidence in the record to support the bankruptcy court's conclusion that Carolin filed its petition for impermissible purposes, thereby satisfying the subjective bad faith prong of the test.

In the first place, the undisputed circumstances surrounding the initial filing of Carolin's Chapter 11 petition strongly suggest improper rather than proper purposes for seeking bankruptcy protection under Chapter 11. The Benz principals manifested their interest in Carolin quite literally at the last minute. The Pitcherskys and their partners formed Benz the day before Carolin filed its petition, and purchased Carolin's stock from Goldstein only hours before the scheduled foreclosure sale of the Lexington property. With but fifty minutes to spare, they then caused Carolin's Chapter 11 petition to be filed, invoked the protection of the automatic stay and successfully frustrated once again an attempt by Mrs. Miller to execute on the deed of trust.

These final hour events would not, standing alone, warrant an inference of bad faith—though they might support in a critical way otherwise justifiable suspicions. By providing for interim emergency relief, including an automatic stay of creditor self-help efforts, the bankruptcy code manifestly sanctions—indeed encourages—not only the eleventh-hour invocation of its protection, but the last minute appearance of new management armed with fresh capital. "It is quite common and not inappropriate for a debtor to use chapter 11 to obtain a

---

**4.** *See* note 1, *supra*.

respite from a creditor or creditors aggressively seeking to collect on a debt, even when execution is imminent...." *In re McStay,* 82 B.R. 763, 768 (Bankr.E.D.Pa. 1988). In such circumstances, a last ditch attempt to forestall imminent financial collapse would obviously *further* the purposes of Chapter 11 if it ultimately facilitated the emergence of new investors offering an "infusion of capital" and previously unavailable "management expertise." *Thirtieth Place,* 30 B.R. at 505.

■ For this reason, an investor's manifest "entrepreneurial motive" in seeking the protection of Chapter 11 for a newly purchased entity would, standing alone, not suffice to establish the subjective lack of good faith that is a prerequisite to summary dismissal. There is certainly nothing inimical to the purposes of the Code in the shrewd identification of the net present value and hidden potential for successful rehabilitation of a struggling business. As indicated, the bankruptcy code affirmatively sanctions the use of its provisions to facilitate the realization of such potential— but only by those willing both to provide for the adequate protection of creditors and to accept the risk that reorganization might ultimately fail. Here, we agree with the bankruptcy court's assessment that the eleventh-hour transactions undertaken by the Benz principals belie the possibility of any such purpose.

There is abundant evidence supporting this assessment. Preeminent is the undisputed record of Carolin's intransigent refusal throughout these proceedings to make adequate provision for the preservation of Miller's rights, notwithstanding the compulsion of an explicit interim protection order and its repeated insistence that the Benz principals had made sufficient funds available for the purpose of seeing the company through the reorganization process.

Closely related is Carolin's failure to make reasonable efforts to secure a substitute tenant for the Lexington property. That the property was fire-damaged of course created a real problem, but it was one not insurmountable if, as Carolin continued to maintain, capital was available for restoring its "business" to a viable state. So far as the record reveals, no steps toward repair were ever taken or actually planned. This conduct by Carolin supports the ultimate inference drawn by the bankruptcy court that its purpose in filing was to delay and frustrate its principal creditor rather than to rehabilitate a distressed but viable business.

This ultimate inference of a deliberate invocation of Chapter 11 protection for abusive rather than permissible purposes is given further and decisive support by the circumstances under which the Benz principals were brought into the picture by Carolin. Assessing those circumstances and the nature of the transaction, the district court concluded that it revealed a classic example of the "new debtor syndrome," a phenomenon increasingly familiar in bankruptcy proceedings involving single-asset debtors.

This recurring pattern is characterized by the creation or revitalization of a one-asset entity on the eve of foreclosure for the sole purpose of "isolat[ing investors from] the insolvent property and its creditors." *Little Creek,* 779 F.2d at 1073. In its typical form, new investors purchase the stock of or create an entity which owns a single tract of improved or unimproved real estate just before foreclosure is scheduled to occur. Speculators can thereby shield themselves, through a dummy corporate structure, from the risk of any loss which might occur if reorganization is unsuccessful or foreclosure later proceeds. The transaction here had all those earmarks. Its principals had effectively eliminated their risk of loss on the venture through the use of not one but two corporate shields: the Benz Holding Company, which was "new," and Carolin itself, which was simultaneously (but only "on paper") "revitalized."

It seems not unfair—certainly not clear error—to see in this a "double dose" of the rightly suspect pattern. A perfectly permissible inference from its presence here, when considered in the totality of other circumstances, is that the entire transaction was a speculative venture which had

as its sole purpose the riskless achievement of one-shot profit, rather than ongoing involvement by the investment of venture capital in a rehabilitative effort. By structuring their participation in a way that effectively shielded themselves from a risk that would continue to be borne solely by the one secured creditor of this single-asset debtor, these principals, including Carolin itself, inferentially manifested an intent to invoke bankruptcy protection for wholly impermissible purposes.

As one bankruptcy court has aptly put it: [B]ad faith is shown if the purpose of a Chapter 11 debtor is to hold a single asset "hostage" in order to speculate that such asset may increase in value [leading] to recover[y of the] original investment at the creditor's risk.

*American Property*, 44 B.R. at 182. Distinguishing between a good faith, though perhaps misguided, effort by late-coming investors to rehabilitate a single-asset debtor's "business," and a bad faith effort to use bankruptcy protections for risk-free speculation in the single asset can obviously present difficult problems of factfinding for bankruptcy courts. In order to protect the integrity of the process and the interests of secured creditors, however, it is a task that must be undertaken on occasion. Here we are satisfied that the bankruptcy court's assessment that this transaction fell in the latter category is supported by the evidence.

## V

In addition to challenging the bankruptcy court's ultimate finding of a want of good faith in filing, Carolin has made a number of other assignments of specific error.

## A

■ Carolin contends that "one-principal-asset debtors are proper subjects for Chapter 11 relief" and that the bankruptcy court erred in concluding to the contrary in dismissing its petition. The premise is of course sound, but it leads nowhere here. The court's dismissal was not rested on any such misperception. That it took this into account as a factor, indeed a critical one in this case, was obviously appropriate as our earlier discussion reveals.

## B

■ Carolin suggests that the court erred to its prejudice in failing to make sufficient inquiry into or any finding upon the debtor's "net equity"—that is the value of the Lexington property in relation to the balance owing on the Miller indebtedness. It is true that the court failed to do this—remarking upon the conflicting evidence of the property's value and the complication created by its fire-damaged condition. Obviously, whether there is net equity in a principal or single asset could be of importance in assessing the possibility of successful reorganization in a particular case. But here we think the failure to nail this down with specificity cannot be held to have tainted the court's ultimate finding that rehabilitation of a viable "business" was here neither possible nor actually intended. It was manifest that the relationship between property value and secured debt was such that substantial new capital would be required to revive any moribund "business" activity that might be thought to exist, while protecting the secured creditor's interest. The court's perception of the ultimate futility of any effort truly to rehabilitate any such "business" was rested in the main on justifiable doubt that there was in truth any "going concern" to rehabilitate and related doubt that the new capital obviously needed to do more than merely hold off foreclosure was actually available. As indicated, we believe those perceptions of the actual facts of the matter were adequately supported in the record and are not drawn in doubt by any uncertainty as to the exact value of any equity here.

## C

■ Carolin next contends that its compliance with the terms of the bankruptcy court's order staying dismissal pending appeal effectively "mooted" the dismissal order itself, because compliance undermined the factual bases of the bankruptcy court's

conclusion that Carolin could not provide "adequate protection" and otherwise fund a plan of reorganization. More broadly, Carolin argues that the bankruptcy court's concerns about its "good faith" should have been addressed only in the context of hearings on the debtor's capacity to provide its creditors with "adequate protection" pending proposal and confirmation of a Chapter 11 plan.

These arguments raise the question of the effect that a debtor's demonstrated ability to provide such protection to its creditors should have on the determination of whether he filed for Chapter 11 protection in good faith. It is obvious that a debtor's capacity to provide adequate interim protection implicates both the objective and subjective elements of the good faith requirement. A petitioner's manifest ability to provide financial protection certainly points in the direction of an ability to carry through with reorganization efforts. Likewise, the debtor's demonstrated willingness to provide interim protection would suggest a purpose to rehabilitate, rather than pervert the bankruptcy process for impermissible purposes. Here, however, we are satisfied that nothing occurring since the dismissal order was entered draws into question the bankruptcy court's original determination that good faith was lacking in this case. As indicated, we have before us a sufficient record of interim developments to permit such an assessment at this level.[5]

The critical facts are these. The bankruptcy court did of course initially stay its order of dismissal pending appeal, but on the stated condition that Carolin would make payments on the obligation to its only secured creditor. We agree that Carolin's compliance with the stay order may initially have evidenced some ability and willingness to facilitate the bankruptcy process, notwithstanding the weighty evidence to the contrary earlier reviewed. We also recognize that there is authority for the proposition that, in some cases, circumstances which develop after a bankruptcy court dismisses a Chapter 11 petition for want of good faith may so substantially undermine

the court's original conclusions that reversal of the dismissal order on appeal is the only appropriate course. *See In re Victory Constr. Co.*, 37 B.R. 222 (9th Cir.Bankr. App.1984) (*Victory III*) (bankruptcy court's original finding of lack of good faith in filing "mooted" by subsequent compliance with protective order staying dismissal pending appeal), *vacating as moot* 9 B.R. 549 (Bankr.C.D.Cal.1981) (*Victory I*); *see also In re Victory Constr. Co.*, 9 B.R. 570 (Bankr.C.D.Cal.1981) (*Victory II*) (stay pending appeal of dismissal order granted on basis of post-dismissal developments).

This is not, however, such a case. Carolin stopped making the adequate protection payments called for by the bankruptcy court's order staying dismissal pending appeal in June of 1988. This not only violated the terms of the stay order but effectively eliminated any cogency to Carolin's claim that it had by then demonstrated its good faith by providing for Miller's protection. Finally, when payments required under the stay order were in arrears for a number of months, the bankruptcy court adopted the eminently prudent course, on Miller's motion, of giving Carolin "one last chance" to comply. When Carolin then failed to meet the court's deadline for curing the default, the court acted on its repeated warnings and dissolved the stay order. Under these circumstances, Carolin's contention of a post-dismissal demonstration of good faith is simply unsupported by the record.

### VI

For the foregoing reasons, the judgment of the district court is affirmed. The parties have briefed and argued the question of whether sanctions should be imposed in this case, but we believe that the bankruptcy court is best equipped to make any such determination and to enter an appropriate order. The case is therefore remanded to the district court, for remand to the bankruptcy court for further proceedings consistent with this opinion.

SO ORDERED.

---

5. *See* note 2, *supra.*

WIDENER, Circuit Judge, dissenting:

I respectfully dissent.

11 U.S.C. § 1112(b) allows the bankruptcy court to dismiss a bankruptcy petition "... for cause, including—

(1) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation;

(2) inability to effectuate a plan;

(3) unreasonable delay by the debtor that is prejudicial to creditors;

(4) failure to propose a plan under section 1121 of this title within any time fixed by the court;

(5) denial of confirmation of every proposed plan and denial of a request made of additional time for filing another plan or a modification of a plan;

(6) revocation of an order of confirmation under section 1144 of this title, and denial of confirmation of another plan or a modified plan under section 1129 of this title;

(7) inability to effectuate substantial consummation of a confirmed plan;

(8) material default by the debtor with respect to a confirmed plan;

(9) termination of a plan by reason of the occurrence of a condition specified in the plan; or

(10) nonpayment of any fees or charges required under chapter 123 of title 28."

Without considering any of the Congressionally mandated reasons for dismissal, the bankruptcy court relied on a judicially created requirement called "lack of good faith in filing" to dismiss. This action was affirmed by the district court and is now affirmed by this court. I would, however, remand to the district court for further remand to the bankruptcy court at the least to consider the grounds for dismissal as set forth in § 1112(b).

The Bankruptcy Act which was replaced by the Code in 1978, contained two sections bearing immediately on this appeal. They are not discussed either by the bankruptcy court, the district court or the majority. They are 11 U.S.C. § 541 and 11 U.S.C. § 546. Both dealt with the petition of a debtor in a corporate reorganization, the same type of proceeding with which we are concerned. § 541 had the explicit provision that the judge's approval upon filing was conditioned upon his being "satisfied" that the petition had been "filed in good faith," the very wording upon which the majority opinion relies here. The catch line of § 546 was the "good faith filing of petition". That section "without limiting the generality of the meaning of the term 'good faith'" gave instances of lack of good faith as including creditors acquiring claims for the purpose of filing the petition; adequate relief being available under Chapter 11; the existence of a prior proceeding giving adequate relief; and being "unreasonable to expect that a plan of reorganization can be effected." Both § 541 and § 546 were repealed and the good faith provision of § 541 does not appear in the Bankruptcy Code. Those provisions of § 546 which do appear do. not relate to good faith.

Since the good faith filing provision was repealed and not reenacted, it seems at least worthy of exploration, especially since the same subject matter discussed here is treated in § 1112(b) of the Code, as to whether Congress meant anything by its repeal of §§ 541 and 546, the good faith filing provisions. See *Sutherland on Statutory Construction*, Sands 4th Ed., (1985) §§ 22.30 and 23.28. It is certain that the result of this case will be that the repeal of those provisions has no effect.

Without suggesting that the repeal of those statutory provisions was without meaning, I believe that even if it was, we have approached this matter with the wrong slant. We seem to take it as a given that "good faith in filing" is something that may be added as a matter of judicial convenience to Congressional requirements of the Bankruptcy Code. This is akin to a violation of the prohibition of *Erie Railroad*, that there is no federal general common law. And while the interstices may be filled in, see *United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 593, 93 S.Ct. 2389, 2397, 37 L.Ed.2d 187 (1973), I suggest that it is appropriate in each case to identify the interstice with the

accompanying need to fill in before undertaking the project, as has been done here.

The case at hand is an illustration of why it is necessary to demonstrate that interstices exist before filling them in. Our opinion, Slip, p. 701, sets out that we require *"both* objective futility and substantive bad faith" in order to warrant dismissal. (Italics in original). We then define objective futility as "whether a reorganization is realistically possible". In any case, I suggest that the words of the panel as to "whether a reorganization is realistically possible" are not so different from the words of Congress in § 1112(b)(2), that a petition may be dismissed for a debtor's "inability to effectuate a plan", to create an interstice. And the same words "whether a reorganization is realistically possible" are also not so different from the words of Congress in § 1112(b)(1) requiring the "absence of a reasonable likelihood of rehabilitation", if there has been a "continuing loss to or diminution of the estate" as the record suggests was present here.

In short, the dismissal of a petition for reorganization is a serious matter, especially under the circumstances present here where the court acts on motion and for a reason not even included in the Bankruptcy Code. To dismiss this case without any consideration by any court in which the matter has been heard as to whether or not the provisions of 11 U.S.C. § 1112(b) have been met, I think, is a mistake of no little magnitude. When Congress has provided specific requirements for dismissal of a case, I do not think it is appropriate for the courts to impose an additional requirement, which certainly is not specifically authorized by Congress, without at least first considering the statutory grounds. It might well be that after a full development, none of the statutory grounds were met, or it could be demonstrated that an interstice existed. At that time, consideration of whether there is a good faith filing requirement might be appropriate. That time, I suggest, is not now, and may not be ever if

a thorough consideration of the process of repeal of the Act and re-enactment of the Code should reveal in fact that Congress meant to repeal the statute as it did.

I, therefore, respectfully dissent.