In re Charles E. SPARRGROVE, III and Jane M. Sparrgrove, Debtors.

Charles E. Sparrgrove, III and Jane M. Sparrgrove, Appellants,

v.

Bank of Monticello, Appellees.

No. 04–C–208–C.

United States District Court, W.D. Wisconsin.

Aug. 11, 2004.

Charles E. Sparrgrove III and Jane M. Sparrgrove, pro se.

Paul W. Schwarzenbart, Lee, Kilkelly, Paulson & Younger, Madison, WI, for Appellees.

## OPINION AND ORDER

CRABB, Chief Judge.

This is an appeal from a final order of the United States Bankruptcy Court dismissing the Title 11 petition of debtor-appellant Charles E. Sparrgrove, III and Jane Sparrgrove. Jurisdiction is present. 28 U.S.C. § 158. The bankruptcy judge dismissed the action after concluding that debtor-appellants had no intention of reorganizing their debt but instead had filed for bankruptcy in order to avoid paying their debts. Debtor-appellants contend that they had not presented their reorganization plan fully and therefore, it would be impossible for the bankruptcy judge to conclude that were acting in bad faith. The bankruptcy court's dismissal will be affirmed. The bankruptcy judge did not abuse his discretion in concluding that appellants were using Title 11 to avoid and challenge their debts rather than to find a means of paying them.

From the briefs submitted by the parties and the record on appeal, I find the following facts solely for the purpose of deciding debtors' appeal.

## FACTS

Creditor-appellee Bank of Monticello extended nine loans to debtor-appellants Charles E. Sparrgrove, III and Jane Sparrgrove, the first in 1999. Several of the loans were secured by appellants' real and personal property. When appellants defaulted on at least one of the secured loans on December 1, 2001, appellee initiated a foreclosure action on their farm property. On August 26, 2002, the Circuit Court for Grant County, Wisconsin, entered judgment against appellants' property in the foreclosure action. The court appointed a receiver, who rented the property to Clifford and Trudy Wachter on a month-to-month lease. The rent payments were used to pay property taxes, insurance premiums and a receivership fee. The remainder was credited to appellants' debts.

On November 7, 2003, debtor-appellants Charles E. Sparrgrove, III and Jane Sparrgrove filed a voluntary petition under Title 11 of the United States Bankruptcy Code. On November 24, 2003, creditor-appellee Bank of Monticello moved pursuant to 11 U.S.C. §§ 362(d) and 554 to lift the automatic stay on the farm or to dismiss the petition for bad faith under 11 U.S.C. § 1112.

On January 15, 2004, the bankruptcy court conducted an evidentiary hearing on the bank's motion. The hearing was held in two parts; at the first, appellee had the burden of showing that appellants had no equity in the farm. If appellee made this showing, the burden would shift to appellants to show that the farm was necessary to a reorganization plan that had a reasonable chance of being approved.

During the first portion, appellee brought an appraiser who testified that the farm property had a fair market value of approximately $567,000 as of August 2002: $457,000 for the land and $110,000 for the structures. In addition, appellee's vice president testified that the total pay-off amount for the debts secured by the real estate was $976,559 as of January 12, 2004. Appellants questioned the appraiser about his reliance on descriptions of the property provided by one of appellee's employees, an appraisal that he had helped conduct two years earlier and what he could see by looking at the property from a neighboring farm. In addition, they attempted to elicit testimony to show that the state-appointed receiver had not obtained as much in rent as he should have and that the Wachters had stolen certain property while they were leasing the farm.

At the conclusion of the first part of the hearing, the bankruptcy judge made a preliminary determination that appellants had no equity in the farm by comparing value of the property to the debts secured against it. The bankruptcy judge then explained to appellants that in order to show that the automatic stay should not be lifted, they must demonstrate that the property was necessary for effective reorganization, that adequate protection was being provided for appellee's interest in the property and that the matter was being pursued in good faith.

During the second portion of the hearing, appellants presented a preliminary reorganization plan that provided for the repayment of a portion of their debt from profits from dairying operations which were to start in April 2004. According to the plan, appellants had two business associates, one who would sell them cows in exchange for a small milk assignment and a second who would perform custom farming and be paid out of the milk check.

Appellants stated that they were not at liberty to divulge the identity of their two business associates. The plan also called for appellants to rent out several of the buildings on the property and for appellant Jane Sparrgrove to get a job. From the remaining milk profits, wages and rent monies, appellant were to make payments of $4,000 each month for five years. Thus, appellants' repayments would total $240,000 under their plan.

Appellants suggested that either the bank or the court should have reduced their debt by upwards of $700,000 because of loan guarantees from the Financial Service Authority and their plan depended on a reduction of at least $250,000. In addition, appellants stated that they were in the process of challenging the validity of their debts in an adversary proceeding. Their adversary claims were based in part on their theory that they held an enforceable land patent and that their mortgage agreement was ineffective because it demanded payment in dollars rather than gold or silver tender. Appellants sought $1.5 million dollars in damages in this action and appellee was one of the named defendants.

Upon being questioned, appellants indicated that they had not presented the numbers in their plan to any financial institution or lender and did not have contracts for the custom farming, the cows or for renting out any of the buildings on the property. It was unclear whether the plan provided for payments of insurance and property taxes. (Mr. Sparrgrove testified that he believed that these payments were listed under unsecured creditors but there was no specific delineation.)

At the conclusion of the presentation of the evidence, the bankruptcy judge allowed each party to make legal arguments. Appellee's lawyer spoke first. Noting that it was appellants' burden to show a reason-able chance of successful reorganization, he stated that the payments called for in the plan did not even come close to the total debt and that appellants' ability to make the payments was speculative. He highlighted the apparent failure to provide for taxes or insurance and summarized the plan as "depending on oral agreements which have not been reduced to contract with people whose identit[ies] aren't being disclosed." Finally, appellee's lawyer argued that the claims in appellants' adversary complaint were frivolous and in any event, barred by the Rooker–Feldman doctrine, claim preclusion or issue preclusion.

After appellee's lawyer had concluded, appellants made the following argument:

> The determination of whether or not retention of our property is necessary for an effective reorganization plan are all questions of controversy that will only be answered after all the non-core claims are properly heard and adjudicated in the district court forum.

> You know, I would just like to point out the Bank of Monticello has been negligent and had they serviced the guaranteed loans properly, they would be receiving almost $700,000 in guaranteed money. We're not saying that . . . was our plan when we got the guaranty, just like I'm sure it wasn't their plan, but that was their reassurance the debt would be covered. . . .

> We believe we will prevail in the United States District Court concerning the non-core issues. We believe the bank's interest in the property and protection of their interest will only be proven once all the non-core issues are adjudicated. For now, they have what they are claiming as a lien, so it wouldn't hurt to let that go a little longer because we need to get these other issues addressed.

> . . .

We realize judgment [ ] of the [land] patent [issue] is not before you, but the Supreme Court case law is clear with legal titles and perfected land patents on the ejections against a debtor in possession will not be upheld in any court of law. Once these matters are adjudicated in the district court forum, we believe there's totally enough evidence to support our argument that those violations did occur and that their loan contracts are fraudulent and hence, they're void.

If the initial contract that we entered upon is void, then everything proceeding from the contract is void. And once given the opportunity for discovery, we'll be able to attain the additional information that will prove all the violations that we've asserted in our non-core complaint, although those issues are things that will obviously have an impact on the value of the estate itself and on the distribution of the assets of the estate.

At the conclusion of these arguments, the bankruptcy judge ruled in favor of appellee. He concluded first that appellants had no equity in the property and then reasoned,

What we've been given is titled a plan summary and is in fact, very summary in fashion. In fact, it's so summary that it took extensive questioning to determine what was really meant. But it's a plan based on obtaining cows in the future which might be milked in the future, which might, might produce income which would exceed the amount which might be promised to the sellers of the cows and to the providers of other farm necessities in a sufficient fund to pay a small amount of the secured creditor.

. . .

[T]he only proposal was to pay $240,000 to the debtors and leave some balloon at the end for which no proposal was made,

except, and this is really I think the most troublesome part, except that there's a proposal to pay that from the proceeds of a lawsuit, the principal claims of which have been found to be frivolous in other lawsuits in other cases, both the notion of gold and silver standard and land patents.

The bankruptcy judge noted that the proposed annual payments were only approximately 8% of the value of the property before concluding that,

when so much of the plan depends on claims that are absolutely frivolous and have been held to be that before, it means that what is being sought here is not really an effort to reorganize at all but an effort to continue to litigate. So I can't find that there's any probability this plan can work.

To keep the principal people involved anonymous so that nobody can question them means that there's really no corroboration that there is anybody who would provide cows. And there's no calculation that suggests if the cows were supplied, that the milk would produce income necessary to support even the plan that's provided, and it's clear that the plan payments would be inadequate to amortize the secured portion of the debt.

In addition, he reasoned that part of the problems of the plan stemmed from a misunderstanding of the law, particularly with respect to what a "cram down" is or how insurance works.

The bankruptcy judge concluded that not only was a lift of the automatic stay warranted, but so was dismissal. In reaching this conclusion, he noted that appellants' plan demonstrated an intention to avoid rather than pay their debts in contravention of the notion of "good faith" applicable in individual bankruptcy cases. He commented that although appellants'

intentions on a human level seemed good, their business intentions were not so good.

## OPINION

■ 11 U.S.C. § 1112(b) authorizes bankruptcy judges to dismiss a bankruptcy proceeding for want of good faith. *Matter of James Wilson Associates*, 965 F.2d 160, 170 (7th Cir.1992). Although it is not entirely clear what constitutes "good faith" in this context, a bankruptcy court should look at the totality of the circumstances and ask whether a debtor is "really trying to pay the creditors to the reasonable limit of his ability, or is he trying to thwart them?" *In re Schaitz*, 913 F.2d 452, 453 (7th Cir.1990); *see also Matter of Love*, 957 F.2d 1350, 1355 (7th Cir.1992).

■ The bankruptcy judge reasoned that appellants' petition for reorganization should be dismissed after he had concluded that they had demonstrated an intent to use bankruptcy to avoid rather than recognize their debts. A bankruptcy judge has broad discretion in dismissing a petition under § 1112(b). His decision may not be reversed unless he abused his discretion or the determination was based on facts that were clearly erroneous. *Matter of Woodbrook Associates*, 19 F.3d 312, 316, 322 (7th Cir.1994). "The clearly erroneous standard requires this court to give great deference to the bankruptcy court" and uphold its conclusion if its "account of the evidence is plausible in light of the record viewed in its entirety . . . ." *Love*, 957 F.2d at 1354 (citing *EEOC v. Sears, Roebuck & Co.*, 839 F.2d 302, 309 (7th Cir.1988)).

■ Appellants argue that the bankruptcy judge could not have made a determination based on the totality of the circumstances because their plan was only preliminary at the time he made his rulings. They contend that because their plan had not been submitted in its totality, the bankruptcy judge could not have determined bad faith under the applicable "totality" standard. Appellants misunderstand the standard. Although a bankruptcy judge must give all parties a chance to submit relevant evidence and consider all that is been presented, the "totality" standard does not require him to hypothesize about what other evidence there might be.

■ In any event, the missing evidence (which I assume to be the identity of the business associates, how appellants intended to pay for insurance, property taxes and their unsecured debts out of the $7,200 allotted and how they would obtain other start-up materials) would not have changed the basis for the bankruptcy judge's conclusion. He did not conclude that appellants were pursuing bankruptcy in bad faith simply because their plan was not well developed. Instead, he based his determination on the fact that appellants' proposal called for payment of only a fraction of the secured debt and that they had argued that the stay should not be lifted so that they could continue to challenge their debts through their adversary complaint, which contained predominantly frivolous claims. (Although I withdrew appellants' adversary complaint from the bankruptcy court after dismissal of their Title 11 petition, the withdrawal was granted for reasons of judicial efficiency. As noted in that opinion, I gave no consideration to the merits of the claims alleged therein. However, I agree with the bankruptcy judge's characterization of the claims that were based on land patents and gold and silver coinage as frivolous. *See* Appellee's Br., dkt. # 5, at 9 n. 5; *see e.g. State of Wisconsin v. Glick*, 782 F.2d 670, 672 (7th Cir. 1986) ("self-drafted 'land patents' are frivolous gestures") (citing *Hilgeford v. Peoples Bank*, 776 F.2d 176 (7th Cir.1985)); *Edgar v. Inland Steel Co.*, 744 F.2d 1276, 1279 n. 4 (7th Cir.1984) (disregarding challenge to

federal fractional reserve banking system).)

In appealing the dismissal, appellants do not deny that their proposal called for repayment of only $240,000, that the farm property (which they would keep under the plan) securing their debts was worth twice that amount or that they wanted the stay in order to prevent losing the farm in the event that they succeeded in the adversary complaint. Not only do the facts support the bankruptcy judge's conclusion that appellants were using bankruptcy as a means of avoiding their obligations, appellants actually argued that they believed a stay was warranted because they were still challenging their debts through their adversary complaint. The purpose of an automatic stay under 11 U.S.C. § 362 is to prevent a " 'chaotic and uncontrolled scramble for the debtor's assets in a variety of uncoordinated proceedings in different courts.' " *Matter of Rimsat, Ltd.*, 98 F.3d 956, 961 (7th Cir.1996) (quoting *In re Holtkamp*, 669 F.2d 505, 508 (7th Cir.1982)). It is not to allow a debtor to delay or frustrate a creditor's ability to collect or to assist the debtors in fighting their obligation to pay their debts.

While the "good faith" standard is an amorphous one, the Court of Appeals for the Seventh Circuit has held that "[t]he clearest case of bad faith is where the debtor enters [title] 11 knowing that there is no chance to reorganize his business and hoping merely to stave off the evil day when the creditors take control of his property." *Id.* at 170–71 (citing *Carolin Corp. v. Miller*, 886 F.2d 693, 700–03 (4th Cir.1989)). In their concluding argument at the hearing, appellants argued, "[w]e believe the bank's interest in the property and protection of their interest will only be proven once all the non-core issues are adjudicated. For now, they have what they are claiming as a lien, so it wouldn't hurt to let that go a little longer because we need to get these other issues addressed." Using bankruptcy proceedings for such dilatory purposes is the essence of bad faith in this context.

In both their proposed plan and in their legal arguments, appellants expressed a clear intent to use bankruptcy proceedings in order to keep property in which they had no equity and in exchange for payments totaling far less than the property's value. In addition, they demonstrated grave misconceptions of applicable banking and bankruptcy principles, including fundamental misapprehensions about cram downs and loan guarantees, bolstering the bankruptcy judge's conclusion that appellants would not be able to develop a plan that had any reasonable chance of being confirmed. For all of these reasons, I find that the bankruptcy judge did not abuse his discretion in concluding that appellants were using bankruptcy proceedings in order to avoid their debts rather than to pay them or in dismissing their petitioner for abusing bankruptcy procedures in this manner. Accordingly, the dismissal is affirmed.

(Appellee has advanced arguments why the bankruptcy judge did not abuse his discretion in lifting the automatic stay and in enjoining appellants from refiling a bankruptcy petition in that court for one year without first obtaining permission from the court. Appellants do not appear to challenge either. Even if they had, their challenges would not have been successful. The propriety of the automatic stay is moot; an automatic stay terminates upon dismissal, 11 U.S.C. § 362(c)(2)(B), and I have already concluded that dismissal was warranted. In any event, the lifting the stay would have been appropriate; the evidence presented at the hearing showed that appellants had no equity in the property and their proposed plan had no rea-

**290**

sonable chance of being confirmed; it depended on success in a lawsuit involving frivolous claims and proposed repayment on a debt against the farm in an amount far below the property's estimated value.

■ As for the automatic stay, the bankruptcy court has broad discretion in enjoining parties from refiling. In this instance, there is a reasoned basis for the injunction. The one-year period will allow appellee an opportunity to collect on the debt uninterrupted by appellants who have attempted to frustrate appellee's ability to do so using any means they can conceive. Because the bankruptcy court provided an exception so that appellants could obtain leave from the court to refile after showing that they intended to reorganize for the purpose of paying their debts, it did not deprive appellants of meaningful access to the court. *In re Chapman,* 328 F.3d 903, 905 (7th Cir.2003).)

### ORDER

IT IS ORDERED that the decision of the United States Bankruptcy Court for the Western District of Wisconsin to dismiss the title 11 petition of appellants Charles E. Sparrgrove III and Jane Sparrgrove pursuant to 11 U.S.C. § 1112(b) is AFFIRMED.