**In re ACI SUNBOW, LLC, Debtor.**

**UNITED ENTERPRISES, LTD., Movant,**

**v.**

**ACI SUNBOW, LLC, Respondent.**

**Bankruptcy No. 96–17406–B11**
**R.S. No. JTHL.**

United States Bankruptcy Court,
S.D. California.

Feb. 20, 1997.

Ali M.M. Mojdehi, Baker & McKenzie, San Diego, CA, for Debtor.

John T. Hansen, Nossaman, Gunther, Knox & Elliott, L.L.P., San Francisco, CA, for United Enterprises, Ltd.

Jeffry A. Davis, Gray Cary Ware & Freidenrich, San Diego, CA, for GLV Capital Partners.

Tiffany L. Carroll, Office of the United States Trustee, San Diego, CA, for Office of U.S. Trustee.

## ORDER ON MOTION FOR RELIEF FROM STAY

PETER W. BOWIE, Bankruptcy Judge.

United Enterprises, Ltd. (United) seeks relief from the automatic stay to foreclose on its first position deed of trust on vacant land now owned by debtor, ACI Sunbow (Sunbow). United asserts several grounds in support of its motion: 1) that the bankruptcy petition was filed in bad faith, therefore supporting relief under 11 U.S.C. § 362(d)(1), for cause; 2) that the property is overencumbered, leaving debtor with no equity interest; and 3) that the property is not necessary to a reorganization which is reasonable either in prospect or in time.

The Court has reviewed the contentions of both sides concerning the value of the property and the prospects for reorganization. The Court concluded that to resolve those issues it will need to conduct an evidentiary hearing, which the Court is prepared to do if it is necessary to resolve the motion. The Court so advised the parties at the initial hearing on the motion. The Court directed the parties to focus on the good faith issue raised by United and, after a lengthy oral argument, afforded both sides the opportunity to supplement their points and authorities, after receipt of which the Court would rule on the bad faith portion of the motion, without addressing either the value of the property or the reasonable prospect of reorganization within a reasonable period of time.

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334 and General Order No. 312–D of the United States District Court for the Southern District of California. This is a core proceeding under 28 U.S.C. § 157(b)(2)(G).

### *FACTS*

The facts relevant to resolution of the good faith portion of the relief from stay motion are not in dispute.

On August 1, 1986 a joint venture named Rancho Del Sur gave to United Enterprises, Inc. a promissory note for $5,000,000, secured by a first position trust deed. United, Inc. is the movant's predecessor in interest. The note was given as partial payment for 707 acres of vacant land. The note provided for repayment of the principal once a final subdivision map was recorded on any portion of the land, and provided for accrual of interest at the rate set by the Internal Revenue Service under 26 U.S.C. § 6601(a). Interest was to be paid ratably with the principal payments as each portion of the subdivision was finally mapped. However, the Note also provided:

> that all outstanding principal, accrued interest and unpaid interest shall be due and payable within ten (10) years from the date of execution of this note, irrespective of whether maker or his assigns have caused the recordation of any final subdivision maps . . . .

Because the Note was dated and executed on August 1, 1986 it became all due and payable on August 1, 1996, unless sooner paid off. The Note has not been paid off. An addendum to the trust deed provided that if the note was not in default in any particular, United Enterprises, Inc. would grant partial releases for the finally mapped portions of its collateral to allow for sales.

Over time, a tentative map for the property was approved, but for unknown reasons no final map was obtained for the property. Indeed, both sides recognize that time is of the essence in this case because the long-standing tentative map on the property expires on May 22, 1997.

The lack of progress in development of the property was manifested in another way. Real property taxes were not paid for several years, and the accrued but unpaid taxes totalled over $960,000 as of August, 1996. Because of the nonpayment of taxes, on June 20, 1996 United recorded a Notice of Default and Election to Sell. It is important to recognize that as of June 20, 1996 Sunbow did not exist. Even more importantly, according to the record, none of Sunbow's principals had any economic involvement with the real property or its then owner, Rancho Del Sur.

During the course of the efforts to develop the property, one or more additional borrowings occurred, secured by a second trust deed, to which the Federal Deposit Insurance Corporation succeeded. FDIC decided to sell its note and second trust deed. By that time, the principal amount and accrued interest on the note was in excess of $25,000,-000. The principals of Sunbow got together and decided to bid for the note and second position trust deed. To do so, they formed ACI Sunbow, a limited liability company, on July 25, 1996. Sunbow submitted its bid of $251,000, approximately 1% of the debt represented by the note, and was the successful bidder.

According to Mr. Horne, one of Sunbow's principals, at the time of the bid:

> The Debtor considered that its options were (1) foreclosure on the Property and resale of the Property, (2) foreclosure and

development of the Property, or (3) foreclosure and joint venture with a homebuilder. The second deed of trust securing the FDIC Note was junior to a lien securing a note in favor of United Enterprises, Ltd.

At the time Sunbow was created, on July 25, 1996 its principals had to have known that United had already commenced foreclosure, having recorded a Notice of Default on June 20, 1996. Sunbow's principals also must have known that United's note would become all due and payable, without acceleration, less than one week later, on August 1, 1996. They had to have known of the arrearage on real property taxes of over $960,000. And they should have known that the total principal and interest due United as of August 1, 1996 was in excess of $9.4 million. Despite their knowledge that the property had about $10.4 million in senior debt on it, Sunbow was created with no equity capital. The principals knew they would have to deal with that large amount of debt, but they provided no capital to do it.

Notwithstanding that set of circumstances, and notwithstanding that none of the principals of the debtor had any prior· economic interest in the property or its development, Sunbow was created and it successfully acquired the FDIC note and junior trust deed. Assignment to Sunbow was recorded on August 2, 1996, the day after the Note owed to United matured by its terms. So far as the record discloses, neither Sunbow nor any of its principals had any prior discussions with United regarding its position and intentions.

Mr. Horne tells us in his declaration: "The Debtor intended eventually to acquire fee title to the Property." Mr. Horne listed a number of the risks associated with buying the FDIC note which were considered by Sunbow's principals. Notwithstanding those risks, Mr. Horne states:

7. Very soon after buying the FDIC Note, the Debtor determined to purchase the Property and did so on August 30, 1996 with a $10 million bid at the trustee's sale. [So far as the record discloses, that was a credit bid based on the FDIC note, not a cash bid.] ... Although at the time of foreclosure I was aware that United Enterprises' note was in default, I was confident that the Debtor would be able to secure funding to pay off United Enterprises or negotiate an extension or purchase of its note.

But the debtor had no capital of its own to use to meet those immediate obligations. It was, and remains an uncapitalized company.

Meanwhile, when United was not paid in full on August 1, 1996, it rescinded the July 20, 1996 Notice of Default based on the real property tax arrearages and, on August 8, 1996 recorded a new Notice of Default and Election to Sell based on the nonpayment of its matured note.

Sunbow did subsequently contact United, and some discussions followed which have been differently characterized by each side, but which have produced no agreement. United briefly postponed the sale date, but no agreement was forthcoming. Before the sale could occur, Sunbow filed its bankruptcy petition under Chapter 11 on December 19, 1996. The record is devoid of any evidence of an intervening economic downturn, or of some unanticipated economic event which prevented an otherwise able entity from meeting its obligations.

As some of the history set out above reflects, since its creation on July 25, 1996 Sunbow has moved at considerable speed. On July 25, it borrowed $620,000 from GLV Capital Partners (GLV), giving them a note and trust deed of the same date. The trust deed was for the property Sunbow would not own until August 30, and the trust deed was not recorded until minutes after Sunbow filed its bankruptcy. Sunbow assembled a team experienced in development and has since pursued with great alacrity the development of the property. However, for whatever reason, Sunbow chose not to pay the real property tax installment due in December, 1996 of over $125,000, with another $10,000 in penalty since imposed on top of that.

Sunbow, of course, owed no obligations prior to July 25, 1996. As of July 25, 1996 it incurred the $620,000 obligation to GLV discussed above. Since then, other debts have arisen for professionals hired by Sunbow to help develop the project. As of the date of

filing, there were 5 such creditors, with claims scheduled at a total of $67,041. But, still, no equity capital has been contributed to the debtor by its principals.

It is also relevant to understand who Sunbow is. Mr. Horne is the president of Ayres Land Company, Inc., and Ayres is the Manager of Sunbow. Mr. Horne states that the principals of Ayres:

> have extensive backgrounds in the acquisition, development, management, financing, and legal aspects of the real estate business. Through various affiliated partnerships, the principals of Ayres have been involved in the acquisition of assets with book values of over $250 million in the last three years, and over $500 million in the last decade.

Ayres was formed in 1994. One other fact of note was disclosed in the Supplemental Declaration of Mr. Mojdehi, debtor's counsel. He advised that the principals of Sunbow had equity and management positions in Portfolio Investments, Ltd., during which time Mr. Mojdehi and his firm represented Portfolio. Portfolio purchased a promissory note and trust deed from the Resolution Trust Corporation arm of the FDIC for the Steele Canyon project, which at the time was in bankruptcy before this Court. Portfolio then sought relief from stay to foreclose on the property, which was granted. It is thus fair to note that Sunbow's principals have some familiarity with the Bankruptcy Court and processes.

Lastly, and without directly assessing the debtor's proposed plan, the debtor has stated its intent not to pay off United on the effective date, but rather to restructure the obligation to stretch it out for 6 more years while requiring partial releases as the debtor is ready to sell portions of United's collateral.

### DISCUSSION

■ Consideration of the facts leads to addressing the good faith issue raised by United in the context of this relief from stay motion. A threshold issue concerns which party has the burden of proof on the issue of good faith raised "for cause" under § 362(d)(1). The issue is rarely discussed. The Court notes that the decision in *Furness*

*v. Lilienfield,* 35 B.R. 1006, 1013 (D.Md.1983) found that the debtor had the burden of proving the petition was filed in good faith. That conclusion is consistent with 11 U.S.C. § 362(g), which provides:

> (g) In any hearing under subsection (d) or (e) of this section concerning relief from the stay of any act under subsection (a) of this section—
>
> (1) the party requesting such relief has the burden of proof on the issue of the debtor's equity in property; and
>
> (2) the party opposing such relief has the burden of proof on all other issues.

See *In re Mildevco, Inc.,* 40 B.R. 191, 194 (Bankr.S.D.Fla.1984).

■ It is too well established to require further iteration that the absence of good faith, though not expressly set out in either § 362 or § 1112, is a basis for granting relief from stay or dismissal. *In re Arnold,* 806 F.2d 937, 939 (9th Cir.1986); *Matter of Little Creek Development Co.,* 779 F.2d 1068, 1072 (5th Cir.1986); *In re Phoenix Piccadilly, Ltd.,* 849 F.2d 1393, 1394 (11th Cir.1988). The central issue on this motion is to define the elements of the test for good faith, after which the elements should be applied to the uncontroverted facts set out above.

Although it is not a decision of the Ninth Circuit, nor has it been adopted by the Ninth Circuit, and is therefore not binding on this Court, at the center of the dispute is the decision of the Fourth Circuit Court of Appeals in *Carolin Corp. v. Miller,* 886 F.2d 693 (1989). It is regularly cited for its statement that:

> *both* objective futility and subjective bad faith be shown in order to warrant dismissals for want of good faith in filing.

*Id.* at 700–701. Many courts, including this one in *In re Boynton,* 184 B.R. 580, 583 (1995) have loosely cited *Carolin* for that statement, without further elaboration or consideration, and without the statement controlling the outcome on a particular motion. This case, however, requires the Court to carefully consider whether the *Carolin* pronouncement reflects the law of the Ninth Circuit on the subject.

In assessing the *Carolin* decision, it is important to understand what it involved factually, procedurally, and in legal conclusion. Carolin was a real estate holding company whose real property and building were in default a year and one-half after purchase. Foreclosure was commenced and the day prior to sale, some former owners incorporated another holding company, which then acquired all of Carolin's stock, and then caused Carolin to file bankruptcy less than one hour before the sale. The Bankruptcy Court dismissed the case for lack of good faith in the filing. As the appellate court reported:

> The court concluded that the Benz principals had formed the holding company and caused Carolin to file its Chapter 11 petition for the purpose of acquiring the Lexington property without paying a fair market price at the imminent foreclosure sale, while preserving the existing financing on the property. *Id.* at 8. The court therefore dismissed the case, on the general grounds that "the investors in Carolin are attempting to pervert the bankruptcy process by using the system to maximize an investment opportunity and minimize the investors' risk at the expense of the secured creditor," without any "legitimate purpose of reorganization."

886 F.2d at 696. The district court affirmed the dismissal and, on further appeal, and despite the notoriety of its decision, so did the Fourth Circuit.

The *Carolin* court reviewed the evolution of decisions involving good faith and on its own purported to classify certain decisions as requiring both objective futility and subjective bad faith, and others which would permit either. Careful review of those decisions does not support such classification, however, at least as to requiring both elements. Indeed, *Carolin* points to no decision that denies relief from stay or dismissal because only subjective bad faith was shown. The fact that other cases had facts which supported findings of both objective futility and subjective bad faith has not and does not establish that findings on both are required, as *Carolin* would hold. To be sure, the *Little Creek* decision, which *Carolin* cites for its own proposition, provides a non-exhaus-

tive list of factors for courts to consider, and some of those factors have objective components while others are subjective. Neither *Little Creek* nor any other decision requires that *all* of the factors exist before relief from stay or dismissal can be granted on bad faith grounds. To be sure, also, *Little Creek* does state:

> Determining whether the debtor's filing for relief is in good faith depends largely upon the bankruptcy court's on-the-spot evaluation of the debtor's financial condition, motives, and the local financial realities.

779 F.2d at 1072. *Carolin* quotes part of the above sentence as support for its conclusion that both objective futility and subjective bad faith must exist. The quoted sentence makes no such conclusion, and is explained in the sentences which immediately followed. The *Little Creek* court continued:

> Findings of lack of good faith in proceedings based on §§ 362(d) or 1112(b) have been predicated on certain recurring but non-exclusive patterns, and they are based on a conglomerate of factors rather than on any single datum. Several, but not all, of the following conditions usually exist. The debtor has one asset, such as a tract of undeveloped or developed real property. The secured creditors' liens encumber this tract. There are generally no employees except for the principals, little or no cash flow, and no available sources of income to sustain a plan of reorganization or to make adequate protection payments.... Typically, there are only a few, if any, unsecured creditors whose claims are relatively small. The property has usually been posted for foreclosure because of arrearages on the debt and the debtor has been unsuccessful in defending actions against the foreclosure in state court.... The "new debtor syndrome," in which a one-asset entity has been created or revitalized on the eve of foreclosure to isolate the insolvent property and its creditors, exemplifies, although it does not uniquely categorize, bad faith cases.

779 F.2d at 1072–1073. In short, *Little Creek* does not purport to require both objective futility and subjective bad faith, despite

the *Carolin* court's effort to so classify it. Rather, it requires a case-by-case assessment of multiple factors.

After making its statement about objective futility and subjective bad faith, the *Carolin* court amplified on its statement. It wrote:

> This means that if the only question raised is whether a reorganization is realistically possible, i.e., if there is no question of the petitioner's subjective good faith in filing, threshold dismissal of a petition is not warranted. In those circumstances the question of ultimate futility is better left to post-petition developments.

That explication makes the purported holding of *Carolin* even less defensible. Although it may be possible to conjure up, it is very difficult to imagine a set of circumstances when a debtor who has no prospects for reorganization is not said to have filed in bad faith precisely for that reason.

But the real point is that the *Carolin* court's pronouncement is directly contrary to the express provision of 11 U.S.C. § 1112(b). In § 1112(b), Congress has expressly authorized dismissal for cause, which is defined to include a debtor's "inability to effectuate a plan". Nowhere did the Congress require in addition to an inability to effectuate a plan proof of subjective bad faith. Moreover, it would be a perversion of the bankruptcy process to allow a debtor to remain under the protection of Chapter 11 to the detriment of creditors once it was established that a debtor could not effectuate a plan, whether because of inability to meet statutory or economic feasibility requirements for confirmation, or otherwise.

■ It is also reasonable to consider that the *Carolin* decision is itself internally inconsistent in light of § 1112(b). First, the *Carolin* decision reaches the conclusion that good faith is an implicit requirement in both § 1112 and § 362. 886 F.2d at 699. Then the decision turns around and writes good faith out of the statutes by requiring objective futility in every case, when § 1112(b) makes clear that objective futility, by itself, warrants dismissal.

■ There is a corresponding inconsistency between *Carolin* and § 362(d). As is well understood, the subparts of § 362(d) are in the disjunctive. Relief from stay may be granted for cause under (d)(1), *or* it may be granted if both requirements of lack of equity and lack of necessity for reorganization are shown. As the court in *In re Can–Alta Properties, Ltd.*, 87 B.R. 89, 91 (9th Cir. BAP 1988) wrote:

> The standards for relief set forth in 11 U.S.C. sections 362(d)(1) and (d)(2) are independant [sic] and alternative. Accordingly, relief may be granted "for cause" under subsection 362(d)(1), despite the existence of equity in the collateral, which would preclude relief from the stay under 11 U.S.C. section 362(d)(2). (Citation omitted.) It is well established that a lack of good faith constitutes "cause" for lifting the stay to permit foreclosure or for dismissing the case.

Equity and necessity for reorganization are some of the objective elements which have crept into the *Little Creek* analysis, but application of the elements of § 362(d)(2) cannot spill over completely into a § 362(d)(1) analysis such that if there is equity and/or the property is necessary for reorganization relief from stay for cause under (d)(1) must be denied. That would write § 362(d)(1) largely out of existence, as well, which is inconsistent with both decisional law and the canons of statutory construction.

Having said all that, the *Carolin* court made several observations which merit continuing consideration. First, in reaching its conclusion that there is a good faith requirement to § 1112(b), the court wrote:

> For three distinct reasons, a generalized "good faith filing" requirement appears implicit in § 1112(b). First, the provision lists *objective* circumstances which presumably justify dismissal because they suggest the futility of reorganization proceedings. Second, and more significantly, the listed circumstances are generally consistent with and may in fact affirmatively evidence a *subjective* lack of good faith on the part of a Chapter 11 petitioner. Finally, of course, § 1112(b) permits dismissal not only in the enumerated circumstances but, more generally, "for cause," further suggesting the propriety of dismissal in the

face of a petitioner's lack of good faith. As the pertinent legislative history put it, "[t]he list is not exhaustive. The court will be able to consider other factors as they arise, and to use its equitable powers to reach an appropriate result in individual cases."

886 F.2d at 699. The *Carolin* court later cautioned:

The dangers of overemphasis on particular indicia or patterns of engaging in mere indicia-counting, and of forcing particular facts into previously identified patterns is obvious, and must be guarded against. We simply note, as have other courts, that a totality of circumstances inquiry is required; that "any conceivable list of factors is not exhaustive"; and that there is no "single factor that will necessarily lead to a finding of bad faith."

886 F.2d at 701. A last discussion by the *Carolin* court of subjective bad faith is one on which this debtor relies, although Sunbow takes it out of context. The court stated that it found "abundant direct and circumstantial evidence ... that Carolin filed its petition for impermissible purposes, thereby satisfying the subjective bad faith prong of the test." 886 F.2d at 703.

The court noted:

In the first place, the undisputed circumstances surrounding the initial filing of Carolin's Chapter 11 petition strongly suggest improper rather than proper purposes for seeking bankruptcy protection under Chapter 11.

*Id.* The court then observed that the Bankruptcy Code contemplates "the eleventh-hour invocation of its protection" and "the last minute appearance of new management armed with fresh capital." *Id.* It was expressly in the context of a struggling business that the *Carolin* court then wrote:

For this reason, an investor's manifest "entrepreneurial motive" in seeking the protection of Chapter 11 for a newly purchased entity would, standing alone, not suffice to establish the subjective lack of good faith that is a prerequisite to summary dismissal. There is certainly nothing inimical to the purposes of the Code in the shrewd identification of the net present

value and hidden potential for *successful rehabilitation of a struggling business*. As indicated, the bankruptcy code affirmatively sanctions the use of its provisions to facilitate the realization of such potential—but only by those willing both to provide for the adequate protection of creditors and to accept the risk that reorganization might ultimately fail.

886 F.2d at 704.

Finally, the *Carolin* court turned to the "new debtor syndrome". It explained:

This recurring pattern is characterized by the creation or revitalization of a one-asset entity on the eve of foreclosure for the sole purpose of "isolat[ing] investors from] the insolvent property and its creditors." ... In its typical form, new investors purchase the stock of or create an entity which owns a single tract of improved or unimproved real estate just before foreclosure is scheduled to occur. Speculators can thereby shield themselves, through a dummy corporate structure, from the risk of any loss which might occur if reorganization is unsuccessful or foreclosure later occurs.

*Id.* The court concluded:

A perfectly permissible inference from its presence here, when considered in the totality of other circumstances, is that the entire transaction was a speculative venture which had as its sole purpose the riskless achievement of one-shot profit, rather than ongoing involvement by the investment of venture capital in a rehabilitative effort. By structuring their participation in a way that effectively shielded themselves from a risk that would continue to be borne solely by the one secured creditor of this single-asset debtor, these principals, including Carolin itself, inferentially manifested an intent to invoke bankruptcy protection for wholly impermissible purposes.

886 F.2d at 704–705. In sum, except for some language which flies directly in the face of congressionally manifested intent in § 1112(b) and § 362(d), much of what the *Carolin* court noted, when taken in the factual context of its case, would support United's motion in this case. As Mr. Horne stated in

his declaration: "The Debtor was created as an entity distinct from its principals to limit their potential liability for environmental hazards related to the adjacent Otay Mesa landfill and in order to raise capital for this unique development opportunity." Of course, creation of the debtor also shielded the assets of the principals from any risk of failure of any "reorganization." It is especially intriguing to consider why creation of a new entity, Sunbow, with its only asset the cash it borrowed from GLV until it bought the note and foreclosed, facilitates borrowing by the debtor when it has no other assets to pledge and no track record of performance.

■ As already noted, regardless of whether application of the *Carolin* decision would support relief to United, *Carolin* is not the law of the Ninth Circuit, which this Court is obliged to apply. In the Ninth Circuit, the Fifth Circuit's *Little Creek* decision is followed. In *In re Arnold,* 806 F.2d 937 (9th Cir.1986) the court wrote:

> The existence of good faith depends on an amalgam of factors and not upon a specific fact. [Citing *Little Creek*] The bankruptcy court should examine the debtor's financial status, motives, and the local economic environment.

806 F.2d at 939. *In re Marsch,* 36 F.3d 825, 828 (9th Cir.1994). In the latter case, the court recognized:

> The term "good faith" is somewhat misleading. Though it suggests that the debtor's subjective intent is determinative, this is not the case. Instead, the "good faith" filing requirement encompasses several, distinct equitable limitations that courts have placed on Chapter 11 filings.

*Id.* The court thus makes clear that objective factors will also support "for cause" dismissals, not subjective bad faith only. Indeed, that is consistent with § 1112(b), but *Marsch* does not hold, nor should it that regardless of how subjectively improper a debtor's motives, dismissal or relief from stay cannot be granted unless objective futility is established. Such a holding would eviscerate the "for cause" provisions of § 362(d)(1) and § 1112.

In the earlier decision *In re Thirtieth Place, Inc.,* 30 B.R. 503, 505 (9th Cir. BAP 1983), cited with approval in *Arnold,* the court observed:

> Chapter 11 of the Bankruptcy Code has one purpose; the rehabilitation or reorganization of entities entitled by statute to its relief, .... A corporation that is created for the purpose of filing bankruptcy is an imposition on the state that charters the corporation and on the Chapter 11 court that serves to rehabilitate and reorganize the corporate debtor. Thus, the factual issue to be determined is whether the debtor was created for the predominant purpose of filing in bankruptcy.

■ As already discussed, the principals of the debtor are sophisticated, experienced land developers who also have a familiarity with the bankruptcy process. They created a new limited liability entity to acquire a junior note and trust deed for 1% of its face value, while knowing there was almost $1 million in arrears in real estate taxes and a 10 year old senior note which matured within days of the debtor's creation. Neither the debtor nor its principals had, or have, the funds to pay the taxes and note in full, nor have they proposed to do so. Yet the principals created a new entity, caused it to borrow money from GLV, and then purchased the non-performing note from the FDIC. Despite no contact of record with the senior secured creditor, United, debtor's principal was "confident" the note could be renegotiated. When foreclosure was imminent, he caused the debtor to file bankruptcy to employ the cramdown power of § 1129(b) to involuntarily restructure United's note.

The decision closest to the facts of this case happens to be one of the most frequently cited decisions in the bad faith area. *In re Victory Const. Co. Inc.,* 9 B.R. 549 (Bankr. C.D.Cal.1981). In that case, the court found Victory was a corporate shell reactivated to purchase a piece of property which was tied up in a separate bankruptcy. The senior secured creditors were seeking relief in the separate case to foreclose on liens which were in default. Victory's principal, Mr. Roven was "an experienced real estate investor." He knew of the problems with the senior liens on the property. He also knew if

the property was purchased from the bankruptcy estate the senior creditors would be able to proceed with their foreclosures. He knew he had two options: pay off the senior lien holders, or take a junior interest and try and negotiate. As in the present case, he chose the latter. He had no agreements with the senior creditors, but decided to invest $5,000, which he called a "crap shoot". 9 B.R. at 561. Victory later paid the balance of the purchase price for the junior interest, $107,500, all of which was borrowed by Victory. The court summarized:

> The debtor purchased the property (i) fully aware that all stays against lien enforcement resulting from the seller's bankruptcy would terminate on passage of title to the debtor, and (ii) without having concluded any enforceable agreements with the lienholders whereby terms of payment were extended or foreclosure efforts were stayed, or deferred....

> At the time of the purchase, the debtor knew and intended that litigation would be instituted to prevent foreclosure of the property in the event the negotiations with the lienholders failed.

9 B.R. at 564.

After extensively reviewing the evolution of the concept of good faith in relief from stays and dismissals, and after analysis of the facts before it, the court concluded:

> The debtor is attempting to use the provisions of Chapter 11 to create and organize a new business, not to reorganize or rehabilitate an existing enterprise, or to preserve going concern values of a viable or existing business.

> The debtor knowingly and with full awareness of the economic risks embarked on a speculative real estate promotion, the keystone of which was the ability to retain existing low interest liens in place.

> This course of conduct was pursued with knowledge that the failure of negotiations with lienholders would leave litigation as the only means available to delay foreclosure (except for payment of the amounts in default).

> The debtor was operated and guided by persons with shrewd and sophisticated appreciation of (i) the financial realities of the real estate market and real estate finance, (ii) the types of legal recourse available to forestall or delay foreclosure, and (iii) the loss, expense, delay and attrition to secured creditors associated with litigation of the sort contemplated by debtor if negotiations with the lienholders failed.

*Id.*

In separately enumerated conclusions, the court set out its ruling:

> 1. This is not a proceeding within the contemplation, intent, or purpose of Chapter 11 of the Code.

> 2. The debtor has acted with the intent to take advantage of the secured creditors' exposure to delay, loss, expense and attrition incident to further prolonged litigation to enforce their rights against the collateral, and has not acted with that candor, frankness, sincerity and willingness to do equity which are the indicia of "good faith".

> 3. The purchase of a quitclaim to fully encumbered property on the eve of foreclosure, with intent to use Chapter 11 to delay the secured creditors in enforcement of their rights, is inconsistent with the purpose, spirit, and intent of the statute, under the facts and circumstances here presented.

. . . . .

> 5. There is neither a going business nor going concern value to preserve or protect in this case, and the preservation of this speculative venture should not be undertaken at the expense of secured creditors.

> 6. The debtor has purchased its way into court. Justice, equity and public policy prohibit this.

9 B.R. at 564–565. Virtually every one of the conclusions stated by the court in *Victory* are equally applicable to the facts of the present case, except that this Court expresses no opinion on whether the property is fully encumbered.

Debtor and GLV have urged the Court to look at the subsequent decisions in the *Victory* case. After granting relief from stay, as discussed above, the *Victory* court granted a

stay of its own order while the debtor appealed. The creditor correctly argued that granting the stay was granting the debtor the very relief it had originally sought in bad faith. Nevertheless, the court concluded that its ruling was sufficiently original, and recognized that denial of the stay would, the court believed, deprive the debtor of the opportunity to obtain appellate review. The court fashioned an adequate protection order which paid the secured creditor a market rate of interest more than two times greater than the contract rate, and conditioned the stay on those payments. In addition, the court required payment of all real property taxes and senior secured lienholders. *In re Victory Const. Co., Inc.,* 9 B.R. 570 (Bankr.C.D.Cal. 1981).

It should be noted that there is a distinct factual difference between *Victory* and the instant case. In *Victory,* the objecting creditor acquired its lien interest in 1978, securing an eight year note. The bankruptcy was filed in 1980, with six years still to run on the note. The creditor's bargained-for right was to receive the contract rate of interest over the life of the note. This case, in sharp contrast, involves a ten year note that was fully matured without acceleration, and with interest accrued but unpaid. Another factual distinction of import is that the tentative map on the property expires in three months. While debtor does not want that to happen, the value of the creditor's interest in the property will be impacted if it does expire. The creditor faces the risk while unable to do anything to protect itself.

Interestingly, the appeal from the original order was argued before the Bankruptcy Appellate Panel in April, 1982, but was not decided until 22 months later. *In re Victory Const. Co., Inc.,* 37 B.R. 222 (9th Cir. BAP 1984). The appellate court characterized events subsequent to the order as indicating that the debtor had "purged" itself of its bad faith by complying with the adequate protection conditions of the stay pending appeal. The court concluded that the appeal was moot because the dispute was now centered on plan confirmation. For that reason, the court expressly declined to rule on the correctness of the original order.

The final chapter was written by a new judge who concluded that the debtor should be granted confirmation of a plan that reinstated the note on its terms, allowed the creditor to retain the adequate protection payments as just that, and that guaranteed performance of the obligation to the creditor by guarantees of multiple parties with demonstrated solvency. *In re Victory Const. Co. Inc.,* 42 B.R. 145 (Bankr.C.D.Cal.1984). Judge Ayer made it very clear that in *Victory* the secured creditor was receiving the bargain he had made on the interest and duration of the note, and that it was fair to hold him to it, particularly in light of the guarantees. The guarantees meant that the interest of the creditor was not at risk. The debtor in the instant case has proposed no such treatment of the debt owed to United, nor could it since it is all past due and payable. In sum, this Court concludes that the subsequent rulings in *Victory* did not undermine the essential verities of the original ruling.

It is essential to understand what Sunbow does not propose to do. Sunbow did not ride in on its proverbial white horse with a sack full of cash to salvage the Rancho Del Sur joint venture. Nor is this a bankruptcy case filed to reorganize Rancho Del Sur to preserve the going concern or to save jobs of Rancho's employees. Nor is there any intent to pay any of the creditors for debts Rancho Del Sur incurred, except for the two unavoidable ones—the real estate taxes and United's senior trust deed. Nor is Sunbow trying to preserve any investment made by any of its principals in the Rancho Del Sur project prior to acquisition of the new land by Sunbow.

The district court in *Furness v. Lilienfield,* 35 B.R. 1006, 1011 (D.Md.1983) observed:

> The policy and purpose behind Chapter 11 proceedings is to give business debtors a respite from impending litigation, in short "a breathing spell." (Citation omitted.) It serves a [sic] " 'a remedy for relief from financial distress' (citation omitted) by permitting 'the rehabilitation of an ongoing business.' " (Citations omitted.)

The essential conclusions are that Sunbow was a stranger to the property, as were its

principals. The property was vacant, with a dormant tentative mapping project in place. The project had no employees, no ongoing business, and no going concern to preserve. Knowing that the senior lien was in default and foreclosure had begun, knowing that the note was on the eve of maturing, and knowing that the debtor had no ability to pay it off, the debtor was created to borrow funds to buy the junior lien and then squeeze United to agree to a restructuring with the threat of bankruptcy. It does not take the declaration of Michael Knowles to establish that fact although the declaration does so unequivocally. Sunbow bought a junior position on a piece of land. It is as if Sunbow has gone to a land sale and said: "I will buy your land, but I will not pay you in cash what you are owed for it. Instead, I will invoke the bankruptcy process to impose on you, over your objection, payment terms I will select, and you will have no choice but to sell to me on those terms." Where there is no prior economic relationship between the proponent and the property, the bankruptcy process has no interest in the transaction because it serves no legitimate bankruptcy interest. It does not preserve a going concern, nor does it salvage a financially troubled business. If Sunbow wants to purchase United's interest in the economic marketplace, it is free to do so, and it may reap the benefits of its market acquisition. Indeed, it could purchase the land at United's foreclosure sale, assuming it were capitalized to do so. But bankruptcy has no role to play in that transaction when the purchaser does not seek to recognize a struggling business or to salvage equity interests previously invested in that struggling enterprise. Among other points already made, there is no "fresh start" purpose for this entity's filing, having only freshly started itself for the express purpose for which it wants to employ the Bankruptcy Code. In short, the debtor is not the sort of petitioner the Congress intended the Bankruptcy Code to aid, and it would be an abuse of the bankruptcy process to allow its misuse in this way. See *In re Phoenix Piccadilly, Ltd.,* 849 F.2d 1393, 1395 (11th Cir.1988); *In re American Property Corp.,* 44 B.R. 180, 182 (Bankr.M.D.Fla.1984); *In re Natural Land Corp.,* 825 F.2d 296 (11th Cir.1987); *In re*

*Mildevco, Inc.,* 40 B.R. 191, 193 (Bankr. S.D.Fla.1984).

■ *Phoenix Piccadilly* directly addresses debtor's argument that if it has a prospect for reorganization, relief from stay properly cannot be granted. The Eleventh Circuit declared:

> Because the bankruptcy court found that a bad faith filing had occurred, it properly did not change the consequences of that finding simply because of the debtor's possible equity in the property or potential for successful reorganization. We reject the debtor's argument that the bankruptcy court cannot ever dismiss a case for bad faith if there is equity in the property because the presence of equity indicates the potential for a successful reorganization. Rather, as this Court stated in *In re Natural Land:*

>> the taint of a petition filed in bad faith must naturally extend to any subsequent reorganization proposal; thus, any proposal submitted by a debtor who filed his petition in bad faith would fail to meet section 1129's good faith requirement.

> 825 F.2d at 298. The possibility of a successful reorganization cannot transform a bad faith filing into one undertaken in good faith.

849 F.2d at 1395. As the court put it: "We hold … that the prospects of a successful reorganization do not override, as a matter of law, the finding of bad faith in this case or compel, as a matter of fact, a contrary finding." 849 F.2d at 1394.

GLV argues that the debtor is providing an infusion of capital not previously available. The argument is disingenuous—providing it to whom? Not Rancho Del Sur. Indeed, Sunbow hasn't even been capitalized by its principals. The land is not a struggling manufacturing operation which will be salvaged or preserved by this purported infusion. The land will remain until someone chooses to invest in developing it. GLV contends the debtor is also providing management expertise not previously available. To whom? The same assessment applies.

GLV also argues that the interests of other creditors must be considered, including its own. Yet the only identified creditors all came to the project in the same circumstances as Sunbow, with the status of the property in full view. GLV's position is even less tenable than the property development professionals'. If the record is to be accepted on its face, GLV loaned to a new entity on the day of its creation $620,000. The new entity had no assets, no income—only a hope to buy a junior trust deed on a troubled property.

### CONCLUSION

For all the foregoing reasons, the Court finds and concludes that debtor knowingly and intentionally came to the property with no prior interest in it. There was no business or going concern which debtor took over or seeks to preserve, just a dormant real estate development project heavily in debt and default. Debtor seeks to use the provisions of Chapter 11 to create a new business for itself, and to embark on a new speculative real estate venture, while denying United its right after ten years to look to its collateral to satisfy the debt owed to it. The Court concludes that Congress did not intend to extend to business adventurers who are strangers to the debt the use of Chapter 11 to coerce agreements from secured creditors under the circumstances present in this case. Further, the Court finds and concludes that under the circumstances of this case, the debtor's filing was a bad faith filing regardless of whether the debtor might be able to reorganize through use of the cramdown power of § 1129(b), an issue on which the Court expresses no opinion at this juncture. The facts of this case meet most of the factors listed in *Little Creek*, plus the considerations set out in the original *In re Victory Const. Co., Inc.,* decision. Debtor is a new entity, and was created to shield the assets of its principals, both from possible environmental liability, and from risk of loss of assets if the real estate development fails. Of course, the debtor has only the one asset, which is encumbered by United's lien. There are no identified employees, only the principals of the debtor and the development professionals they have employed. There is no cash flow, and will not be for some time to come. Debtor and GLV argue there will be funding available to develop the project, and to provide a bond for the required improvements which are anticipated to cost $10–30 million. Those funds are not presently in the debtor's possession. But even with all the *Little Creek* factors which favor a finding of bad faith, the subjective bad faith of the debtor in attempting to use the bankruptcy process not to reorganize or rehabilitate a struggling entity, but rather to organize a speculative real estate venture at the risk of the secured creditor, warrants the ruling on this motion.

Accordingly, United's motion for relief from stay shall be, and hereby is granted.

IT IS SO ORDERED.