### In re DETIENNE ASSOCIATES LIMITED PARTNERSHIP, Debtor.

No. 05–64797–11.

United States Bankruptcy Court, D. Montana.

Feb. 13, 2006.

Michael J. Bayuk, Helena, MT, for U.S. Small Business Administration, Creditor.

Daniel D. Manson, Butte, MT, for Holiday Hospitality Franchising, Inc., Creditor.

Daniel P. Mckay, Great Falls, MT, for Office of the U.S. Trustee, U.S. Trustee.

Jonathan R. Motl, Reynolds, Motl and Sherwood, P.L.L.P., Helena, MT, for Mountain West Bank, N.A., Creditor.

James A. Patten, Billings, MT, for Detienne Associates Limited Partnership, Debtor.

Ross P. Richardson, Butte, MT, for Fremont Investment and Loan, Creditor.

## MEMORANDUM of DECISION

RALPH B. KIRSCHER, Bankruptcy Judge.

In this Chapter 11 bankruptcy, after due notice, a hearing was held February 7, 2006, in Butte on the Motion to Dismiss Case filed by Fremont Investment and Loan ("Fremont") on November 22, 2006. Fremont was represented at the hearing by attorney Ross Richardson, of Butte, Montana, and the Debtor was represented by attorney James A. Patten, of Billings, Montana. Kevin Detienne testified. No exhibits were offered into evidence. This Memorandum of Decision sets forth the Court's findings of fact and conclusions of law.

## BACKGROUND

The history of this Debtor was previously set forth by this Court in a Memorandum of Decision entered on July 29, 2005, in Debtor's prior Chapter 11 bankruptcy case, Case No. 04–63115:

Debtor is a limited partnership that has been family owned since the early 1970's. Currently, Kevin Detienne ("Kevin")

serves as Debtor's general partner and Kevin's sibling serves as a limited partner. Debtor operates as a holding company and its primary asset is a 71 room hotel in downtown Helena, Montana that operates under a franchise agreement with Holiday Inn. The hotel, known as the Holiday Inn Helena Downtown, also has a restaurant, lounge, nightclub, swimming pool, jacuzzi, exercise room and a meeting/convention area.

Park Plaza Hotel, Inc. ("Park Plaza") oversees the day-to-day activities of the Holiday Inn Helena Downtown. Park Plaza is owned solely by Kevin. Kevin has managed the day-to-day operations of the hotel since 1992 and is currently the General Manager of the hotel and intends to remain in that capacity.

The hotel was constructed in 1971 and was purchased by Debtor in 1984. In 1998, Debtor began an extensive remodel of the hotel which included acquisition of the Holiday Inn franchise. Debtor obtained bids for the remodel project and accepted the bid of a contractor from out of state. The remodel project did not go as planned and Debtor incurred unanticipated expenses to rectify and fix construction defects, resulting in a one year delay of the remodel project and project overages of $790,000.00.[1]

Kevin testified that Debtor's financial problems were compounded during the end of the construction project when local area forest fires in 2000 put a damper on summer tourism. Also, between 2000 and 2004, 4 new hotels were built in the Helena area, increasing the supply of rooms in Debtor's market area by approximately 60 percent.

---

1. As a result of the construction defects, Debtor obtained a judgment against Designtex Enterprises in the sum of $2,012,281.00, but Debtor does not believe it will be able to collect on the judgment.

The financial strains caused by the remodel project, reduced tourism as a result of fires in 2000 and an increase in the supply of hotel rooms in the Helena area prompted Debtor to seek protection under Chapter 11 of the Bankruptcy Code on October 13, 2004. As admitted in Debtor's Amended Disclosure Statement, the "Debtor's finances ... are intertwined with the operations of the Park Plaza Hotel. The Debtor's ability to fund the Chapter 11 Plan is dependent, in its entirety, in the ability of Park Plaza Hotel to make the rent payments due to the Debtor. Therefore, in order to understand and appreciate the Debtor's financial projections, it is necessary to understand and appreciate the operations of the Park Plaza Hotel."

Debtor's Amended Disclosure Statement sets forth several tables summarizing the financial performance of Park Plaza for 2001, 2002, 2003 and 2004. Debtor also provides a table setting forth Debtor's operating expenses for the same years. The foregoing tables include a rent expense for Park Plaza and rental income for Debtor. According to Kevin's testimony, Park Plaza has not paid rent to Debtor for some time, as is reflected in the fact that Park Plaza owes Debtor approximately $660,707.00 in past due rent. Also, the expenses for Park Plaza show a property tax expense of $63,763.00 in 2004, $63,798.00 in 2003, $63,798.00 in 2002 and $67,658.00 in 2001. The Court questions whether Park Plaza paid such taxes as Debtor provides for the payment of delinquent property taxes in the sum of $137,000.00.[2] At any rate, given the interrelatedness between Debtor and Park Plaza, the Court has reconfigured Debtor's tables to delete the transactions between Debtor and Park Plaza. In particular, the Court has removed rent expense and rental income. The Court has also excluded noncash items from its tables, such as depreciation and amortization since such items do not impact Debtor's cash flow. This Court's table of the income and expenses of Debtor and Park Plaza, as set forth in the Court's July 29, 2005, Memorandum of Decision, is set forth below, but has been modified to reflect a change reported by Debtor in the average daily rate for 2003, to reflect a change in the rooms sold and percent occupancy for 2004 (presumably to reflect actual numbers rather than a combination of actual and projected), and includes the revised numbers reported by Debtor for 2005:

|  | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|
| Rooms Sold | 18368 | 17591 | 16876 | 16075 | 16995 |
| Average Daily Rate | 68.64 | 71.63 | 67.22 | 66.21 | 69.07 |
| Percent Occupancy | 71% | 68% | 65% | 63% | 66% |
| Rooms | 1260741 | 1260094 | 1138229 | 1080720 | 1173809 |
| Food | 757709 | 562589 | 541667 | 496474 | 542579 |
| Beverage | 515265 | 553555 | 521027 | 456306 | 393795 |
| Other Food & Beverage | 202066 | 190467 | 206072 | 144227 | 158713 |
| Telephone | 16798 | 10420 | 10623 | 6150 | 5883 |
| **TOTAL REVENUE** | 2752579 | 2577125 | 2417618 | 2183877 | 2274779 |
| Room Expense | 40017 | 30224 | 29852 | 18521 | 28328 |
| Room—Payroll | 309314 | 261905 | 252970 | 258009 | 306150 |
| F & B Cost of Sales | 466164 | 453646 | 465254 | 432144 | 437076 |
| F & B—Payroll | 584816 | 538441 | 474439 | 432999 | 427513 |
| **DEPARTMENT EXPENSES** | 1400311 | 1284216 | 1222515 | 1141673 | 1199067 |

**2.** Exhibit A attached to Fremont's post-hearing brief reflects that Debtor may actually owe in excess of $185,000.00 for past due property taxes.

| | | | | | |
|---|---:|---:|---:|---:|---:|
| **GROSS PROFIT** | 1352268 | 1292909 | 1195103 | 1042204 | 1075712 |
| Other Income | | | | | |
| Interest Income | 62248 | 8921 | 12027 | 9004 | 9277 |
| **REVENUES** | 1414516 | 1301830 | 1207130 | 1051208 | 1084989 |
| Other Expenses of Park Plaza | | | | | |
| General & Administrative | 88768 | 136275 | 179326 | 197463 | 238480 |
| Marketing | 105337 | 176175 | 81137 | 118738 | 127473 |
| Franchise Fees | 138403 | 72313 | 116878 | 107755 | 120857 |
| Energy | 131546 | 126409 | 141700 | 139046 | 187929 |
| Property Operations & Maintenance | 278873 | 206801 | 95886 | 93894 | 121457 |
| Property Taxes | 67658 | 63798 | 63798 | 63763 | 60446 |
| Insurance | 26926 | 28772 | 35378 | 41415 | 43729 |
| Interest | 120079 | 59693 | 41424 | 41439 | 68545 |
| Misc. Expense | 15978 | 31558 | 74844 | 14033 | 23130 |
| Total other expenses of Park Plaza | 973568 | 901794 | 830371 | 817546 | 992046 |
| Other Expenses of Debtor | | | | | |
| Accounting & Legal | 8569 | 8350 | 2291 | 9038 | 16726 |
| Bank Charges | 321 | 262 | 272 | 50 | 0 |
| Consulting Expense | 33000 | 40750 | 37345 | 36000 | 36000 |
| Life Insurance | 6036 | 6036 | 6036 | 6036 | 5254 |
| Lease Expense | 6981 | 7316 | 7030 | 1977 | 0 |
| Misc. Expense | 5054 | 69 | 16011 | 279 | 5278 |
| Total other expenses of Debtor | 59961 | 62783 | 68985 | 53380 | 63258 |
| **TOTAL OTHER EXPENSES** | 1033529 | 964577 | 899356 | 870926 | 1055304 |
| **NET INCOME** | 380987 | 337253 | 307774 | 180282 | 29685 |

In addition to the foregoing, Debtor and Park Plaza report interest expense of $351,912 in 2001, $281,337 in 2002, $249,692 in 2003, $308,289 in 2004, and $297,224 in 2005.

At the hearing on confirmation of Debtor's Chapter 11 Plan held June 7, 2005, the parties stipulated that Rocky Mountain Bank is not a creditor of Debtor. Rather, Rocky Mountain Bank has a lien against the liquor license, inventory, accounts, furniture, fixtures, equipment and general intangibles of Park Plaza. Following the hearing on confirmation of Debtor's Chapter 11 plan, Park Plaza and Rocky Mountain Bank entered into a "Change in Terms Agreement" whereby Park Plaza agreed to make monthly payments of $6,700.00 to Rocky Mountain Bank for a period of 120 months starting July 20, 2005, at an adjustable rate of interest that was 7.75%. Payments under the above Change in Terms Agreement are not reflected in the Court's above combined summary of operations for Debtor and Park Plaza.

In the same Memorandum of Decision entered July 29, 2005, and per an Order entered that same date, confirmation of Debtor's Chapter 11 Plan was denied and the case was dismissed. Debtor filed a Motion to Reconsider on August 5, 2005, requesting that the Court reconsider the dismissal of Case No. 04–63115, and allow Debtor to file a plan of liquidation. After notice and hearing, the Court entered an Order on September 6, 2005, finding that the evidence before the Court did not support anything other than dismissal of the case. Debtor's prior bankruptcy case was then closed on September 26, 2005.

The closure of Debtor's prior bankruptcy was followed by the filing of a second voluntary bankruptcy petition by Debtor on October 14, 2005. The Schedules filed by Debtor in this case are virtually identical to the Schedules filed by Debtor in Case No. 04–63115 and in fact, reflect 04–63115 as the case number rather than the case number of this Chapter 11 bankruptcy.[3] Debtor filed amended Schedules B, D, F and H on February 3, 2006. Debtor filed a Disclosure Statement and a Chapter 11 Plan, providing for the liquidation of all the Debtor's assets, on February 6, 2006.

## DISCUSSION

■■■■ As noted above, Fremont filed a Motion to Dismiss on November 22, 2005, seeking the dismissal of this case under 11 U.S.C. § 1112(b), asserting that Debtor commenced this case in bad faith. Section 1112(b) of the Bankruptcy Code provides that "on request of a party in interest ... and after notice and a hearing, the court may ... dismiss a case under this chapter ... for cause[.]" Section 1112(b) then provides a laundry list of items that constitute cause warranting dismissal. Although a debtor's bad faith in filing a petition is not an enumerated reason for dismissal under § 1112(b), courts have overwhelmingly held that a lack of good faith in filing a Chapter 11 petition establishes cause for dismissal. *See, e.g., In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072 (5th Cir. 1986); *In re Stolrow's, Inc.*, 84 B.R. 167, 170 (9th Cir. BAP 1988); *In re ACI Sunbow, LLC*, 206 B.R. 213, 217 (Bankr.

S.D.Cal.1997). As aptly articulated by one court:

A case under Chapter 11 may be dismissed for cause pursuant to section 1112 of the Bankruptcy Code if the petition was not filed in good faith. *Albany Partners, Ltd. v. Westbrook (In re Albany Partners, Ltd.)*, 749 F.2d 670, 674 (11th Cir.1984). *See also Shell Oil Co. v. Waldron (In re Waldron)*, 785 F.2d 936 (11th Cir.), (Chapter 13 petition dismissed because of bad faith filing.), *cert. dismissed*, 478 U.S. 1028, 106 S.Ct. 3343, 92 L.Ed.2d 763 (1986).

*In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393, 1394 (11th Cir.1988).

■■■■ The decision whether to dismiss a case for a lack of good faith "is a matter for the bankruptcy court's discretion." *Stolrow's*, 84 B.R. at 170. A determination of bad faith is made after examining a totality of the circumstances:

[T]here is no particular test for determining whether a debtor has filed a petition in bad faith. Instead, the courts may consider any factors which evidence "an intent to abuse the judicial process and the purposes of the reorganization provisions" or, in particular, factors which evidence that the petition was filed "to delay or frustrate the legitimate efforts of secured creditors to enforce their rights." *In re Albany Partners, Ltd.*, 749 F.2d at 674.

*Phoenix Piccadilly*, 849 F.2d at 1394. In a well reasoned opinion, the Bankruptcy Court for the Southern District of California fashioned a test for determining the existence of bad faith:

**3.** The Court would note that the List of Creditors Holding 20 Largest Unsecured Claims filed by the Debtor in both this case and the prior bankruptcy case list Kevin as a creditor. The inclusion of Kevin as a creditor is a violation of F.R.B.P. 1007(d), which reads: "In addition to the list required by subdivision (a) of this rule, ... a debtor in a voluntary chapter 11 reorganization case shall file with the petition a list containing the name, address and claim of the creditors that hold the 20 largest unsecured claims, *excluding insiders*[.]"

In the Ninth Circuit, the Fifth Circuit's *Little Creek* decision is followed. In *In re Arnold,* 806 F.2d 937 (9th Cir.1986) the court wrote:

> The existence of good faith depends on an amalgam of factors and not upon a specific fact. [Citing *Little Creek*] The bankruptcy court should examine the debtor's financial status, motives, and the local economic environment.

806 F.2d at 939. *In re Marsch,* 36 F.3d 825, 828 (9th Cir.1994). In the latter case, the court recognized:

> The term "good faith" is somewhat misleading. Though it suggests that the debtor's subjective intent is determinative, this is not the case. Instead, the "good faith" filing requirement encompasses several, distinct equitable limitations that courts have placed on Chapter 11 filings.

*Id.* The court thus makes clear that objective factors will also support "for cause" dismissals, not subjective bad faith only. Indeed, that is consistent with § 1112(b), but *Marsch* does not hold, nor should it that regardless of how subjectively improper a debtor's motives, dismissal or relief from stay cannot be granted unless objective futility is established. Such a holding would eviscerate the "for cause" provisions of § 362(d)(1) and § 1112.

In the earlier decision *In re Thirtieth Place, Inc.,* 30 B.R. 503, 505 (9th Cir. BAP 1983), cited with approval in *Arnold,* the court observed:

> Chapter 11 of the Bankruptcy Code has one purpose; the rehabilitation or reorganization of entities entitled by statute to its relief, . . . .

*In re ACI Sunbow, LLC,* 206 B.R. 213, 221 (Bankr.S.D.Cal.1997). Consistent with the foregoing, the Court in *Stolrow's* articulated eight factors that are generally present in bad faith cases and which may be considered by court's:

(1) The debtor has only one asset.

(2) The secured creditors' lien encumbers that asset.

(3) There are generally no employees except for the principals.

(4) There is little or no cash flow, and no available sources of income to sustain a plan of reorganization or to make adequate protection payments.

(5) There are few, if any, unsecured creditors whose claims are relatively small.

(6) There are allegations of wrongdoing by the debtor or its principals.

(7) The debtor is afflicted with the "new debtor syndrome" in which a one-asset equity has been created or revitalized on the eve of foreclosure to isolate the insolvent property and its creditors.

(8) Bankruptcy offers the only possibility of forestalling loss of the property.

*Stolrow's,* 84 B.R. at 171.

In the instant case the totality of the circumstances show that Debtors cannot satisfy either the objective test or the subjective test for good faith. The objective futility inquiry is designed to insure that there is embodied in the petition "some relation to the statutory objective of resuscitating a financially troubled [debtor]." *In re Coastal Cable TV, Inc.,* 709 F.2d 762, 765 (1st Cir.1983). A court should therefore concentrate on assessing whether "there is no going concern to preserve . . . and . . . no hope of rehabilitation, except according to the debtor's 'terminal euphoria.'" *Little Creek,* 779 F.2d at 1073.

In the case *sub judice,* the Debtor's projections for 2005, as set forth in its

Amended Disclosure Statement filed February 28, 2005, in Case No. 04–63115, were vastly different from the numbers reported by Debtor in the Disclosure Statement filed by Debtor in this case on February 6, 2006. The differences are as follows:

|  | 2005 Income and Expenses Reported by Debtor In 2005 | 2005 Income and Expenses Projected by Debtor In 2004 |
|---|---|---|
| Rooms Sold | 16995 | 16648 |
| Average Daily Rate | 69.07 | 69.56 |
| Percent Occupancy | 66% | |
| | | |
| Rooms | 1173809 | 1158000 |
| Food | 542579 | 506403 |
| Beverage | 393795 | 465432 |
| Other Food & Beverage | 158713 | 147112 |
| Telephone | 5883 | 6273 |
| **TOTAL REVENUE** | 2274779 | 2283220 |
| | | |
| Room Expense | 28328 | 18891 |
| Room—Payroll | 306150 | 263169 |
| F & B Cost of Sales | 437076 | 388734 |
| F & B—Payroll | 427513 | 441659 |
| **DEPARTMENT EXPENSES** | 1199067 | 1112453 |
| | | |
| **GROSS PROFIT** | **1075712** | **1170767** |
| | | |
| Other Income | | |
| Interest Income | 9277 | 0 |
| | | |
| **REVENUES** | 1084989 | 1170767 |
| | | |
| Other Expenses of Park Plaza | | |
| General & Administrative | 238480 | 116444 |
| Marketing | 127473 | 121112 |
| Franchise Fees | 120857 | 115800 |
| Energy | 187929 | 141827 |
| Property Operations & Maintenance | 121457 | 95772 |
| Property Taxes | 60446 | 65038 |
| Insurance | 43729 | 42244 |
| Interest | 68545 | |
| Misc. Expense | 23130 | 14314 |
| **Total other expenses of Park Plaza** | 992046 | 712551 |
| | | |
| Other Expenses of Debtor | | |
| Accounting & Legal | 16726 | 5000 |
| Bank Charges | 0 | 100 |
| Consulting Expense | 36000 | 0 |
| Life Insurance | 5254 | 0 |
| Lease Expense | 0 | 0 |
| Misc. Expense | 5278 | 200 |
| | | |
| **Total other expenses of Debtor** | 63258 | 5300 |
| | | |
| **TOTAL OTHER** | **1055304** | **717851** |
| | | |
| **EXPENSES** | | |
| | | |
| **NET INCOME** | 29685 | 452916 |

The above numbers highlight Debtor's and Park Plaza's dismal financial picture and demonstrate Debtor's "terminal euphoria". Debtor projected in early 2005 that it and Park Plaza would generate revenues of $452,916, which revenues could be used to pay on the obligations owing to: (1) Rocky Mountain Bank in excess of $500,000; (2) Lewis & Clark County, which Fremont asserts is in excess of $185,000; (3) Fremont in excess of $3,000,0000; (4) Mountain West Bank of roughly $293,441.18; (5) American Casualty of $118,000; and (6) the Small Business Administration of $312,575.76.[4] In addition to the foregoing, Debtor's Schedules filed in this case reflect a new secured obligation owing to Richard Shepherd in the sum of $110,157.20. In sum, Debtor has incurred additional debt, has not made a single payment to Fremont, and presumably has not made any payments to Lewis & Clark County, American Casualty or the Small Business Administration.

Further showing Debtor's dismal financial picture is the fact that Debtor's cash position is listed by Debtor at exactly the same amount as it was in 2004, namely that Debtor has two certificate of deposits totaling $36,112.02 and a negative checking account balance of $3,363.35. Debtor contemplates in the Disclosure Statement filed February 6, 2006, that it will somehow be able to miraculously pay $386,000 in administrative expenses upon confirmation. Based upon the numbers provided by Debtor, Debtor does not have the funds to pay even its projected administrative expenses.

The subjective bad faith inquiry is aimed at determining whether the petitioner's real motivation is "to abuse the reorganization process" and "to cause hardship or to delay creditors by resort to the Chapter 11 device merely for the purpose of invoking the automatic stay, without an intent or ability to reorganize his financial activities." *Carolin Corp. v. Miller*, 886 F.2d 693, 702 (4th Cir.1989) (*quoting In re Thirtieth Place, Inc.*, 30 B.R. 503, 505 (9th Cir. BAP 1983)). Debtor's historical financial numbers clearly show that Debtor filed this Chapter 11 case solely to invoke the automatic stay, thereby frustrating and delaying Fremont's scheduled foreclosure sale.

Compelling evidence against Debtor is found in the Statement of Business Income and Expenses that accompanied the Schedules filed by Debtor in Case No. 04–63115, wherein Debtor disclosed its gross income for the previous 12 months as $369,000 and its total monthly expenses at $6,503. In the Statement of Business Income and Expenses filed in this case nearly one year later, Debtor discloses in the Statement of Business Income and Expenses that its gross income for the previous 12 months dropped to $136,483.33, while monthly expenses remained the same.

The foregoing is troubling in two respects. First, Debtor admittedly experienced a drastic drop in gross income from October of 2004 to October of 2005. Second, other than some minor interest income, Debtor's sole source of revenue stems from rental income owed to Debtor by Park Plaza. According to prior testimony, Park Plaza has not made any rent payments to Debtor in sometime, which is partially reflected in Debtor's amended Schedule B filed February 3, 2006, which

---

4. The above amounts do not include administrative claims, priority claims or general unsecured claims.

lists an accounts receivable owed by Park Plaza to Debtor in the sum of $1,126,976.58.[5] Kevin testified in Debtor's prior bankruptcy that the above obligation was essentially uncollectible.

Finally, Debtor entered into a Stipulation for Adequate Protection with Fremont. The Stipulation was filed with the Court on February 1, 2006, was approved by the Court on February 2, 2006, and provides for monthly adequate protection payments of $17,500. Debtor, without rental income from Park Plaza, has no ability to make the agreed adequate protection payments. Moreover, using the combined income and expense figures of Debtor and Park Plaza for 2005, the two entities combined had enough income during the entire year to make less than 2 adequate protection payments to Fremont.

The historical financial evidence in this case shows that this Debtor is simply going further into the hole each and every day. At this late stage in the game, no going concern value exists to preserve and the time has come to put this Debtor in its final resting place. Accordingly, the Court will enter a separate order providing as follows:

IT IS ORDERED that a separate order will be issued by this Court providing that the Motion to Dismiss Case filed by Fremont Investment and Loan on November 22, 2006, is GRANTED; and this case is dismissed for cause pursuant to 11 U.S.C. § 1112(b).

---

5. This obligation increased from $660,707.00 as set forth in Schedule B filed in Debtor's prior bankruptcy case.