# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 00-1389

_____

| | | |
|---|---|---|
| In re Cedar Shore Resort, Inc., | * | |
| | * | |
| Debtor. | * | |
| | * | |
| Cedar Shore Resort, Inc. | * | |
| | * | |
| Appellant, | * | Appeal from the United States |
| | * | District Court for the District |
| v. | * | of South Dakota. |
| | * | |
| Paul Mueller and Mary Pat Mueller, | * | |
| | * | |
| Appellees. | * | |

_____

Submitted: October 20, 2000
Filed: December 13, 2000

_____

Before HANSEN, MURPHY, and BYE, Circuit Judges.

_____

MURPHY, Circuit Judge.

Cedar Shore Resort, Inc. (Cedar Shore), filed for bankruptcy protection after it was served with a shareholder lawsuit. Following an evidentiary hearing, the bankruptcy court[1] found that Cedar Shore had filed in bad faith and dismissed its

_____

[1]The Honorable Irvin N. Hoyt, United States Bankruptcy Judge for the District of South Dakota.

petition. The district court[2] affirmed the decision of the bankruptcy judge, and Cedar Shore appeals from its judgment of dismissal. We affirm.

## I.

Cedar Shore operates a resort facility in Oacoma, South Dakota. During its early years the resort suffered a series of misfortunes, including a fire, an explosion, harsh weather conditions, and flooding, and Cedar Shore initially had difficulty generating a profit and fulfilling its loan obligations to its principal lender, Norwest Bank. The bank did not threaten or initiate any type of foreclosure proceedings against the resort, however, and the parties worked together to modify the loan agreement in a mutually acceptable manner. In 1997 Norwest amended the loan agreement so that Cedar Shore would only be required to make interest payments on its debt.

Later that year Cedar Shore hired a consultant who described it as a "bankrupt company" and urged that it either file for Chapter 7 bankruptcy or reorganize its debt. The board of directors unanimously voted not to file. Instead, Cedar Shore worked with Norwest to restructure the terms of its loan agreement. Under the terms of a plan reached in February 1998, Norwest agreed to reduce the corporate debt it was owed by almost $2 million in exchange for a $500,000 capital contribution by Cedar Shore shareholders. The Cedar Shore board scheduled a shareholder meeting for April 1998 to vote on the proposal.

Before the meeting could take place, shareholders Paul and Mary Pat Mueller brought an action in state court against Cedar Shore, its officers and directors, and its management company. The suit alleged minority shareholder oppression, waste, and mismanagement; breach of fiduciary duty; and tortious interference with prospective

---

[2]The Honorable Lawrence L. Piersol, Chief United States District Judge for the District of South Dakota.

business advantage. The Cedar Shore board held a meeting on March 12, 1998 to discuss its response to the Mueller lawsuit. The members of the board, many of whom had been named as defendants in the lawsuit, did not take any action to investigate the Muellers' claims. Instead, the board voted to file for bankruptcy.

Cedar Shore filed a petition under Chapter 11 on May 20, 1998, and its attorney decided shortly thereafter that the Muellers' claims were really derivative in nature, that they were actually raised on behalf of the corporation, and that they were meritless. The attorney later testified that he had spent approximately sixty hours doing his analysis. He admitted that his study had not come "anywhere close" to the type of investigation typically undertaken in similar cases.

Cedar Shore entered into a settlement agreement with its officers, directors, and management company in which the claims were treated as derivative. See Fed. R. Bank. P. 9019(a). Under the agreement Cedar Shore was to release its claims against the other parties in exchange for their promise not to seek indemnification from it. Cedar Shore then moved the bankruptcy court to approve the agreement. After the bankruptcy court agreed that most of the claims were derivative and thus belonged to the estate, Cedar Shore amended the settlement agreement to provide for a $30,000 payment to each officer and director.

The Muellers opposed the settlement agreement and moved to dismiss the bankruptcy petition as being filed in bad faith. Cedar Shore then moved for approval of a reorganization plan that it filed which was essentially identical to the agreement that it had reached with Norwest in February 1998, before the Mueller lawsuit.

The bankruptcy court scheduled a hearing to evaluate the motions. The Muellers presented evidence that Cedar Shore had already solved most of its financial problems and that its bankruptcy filing was motivated by a desire to rid itself of their lawsuit rather than to effectuate a legitimate reorganization. Cedar Shore president Edward

-3-

Geddes admitted on cross examination that the corporate revenues in 1997 and 1998 had significantly exceeded those from previous years and that the management team was "pleased with the bottom-line performance of the resort." He also acknowledged that Cedar Shore had anticipated operating at a loss for several years and had not expected a profit until 2000. He admitted that shortly before filing for bankruptcy, he had told a group of Cedar Shore creditors that business was going very well and had exceeded expectations for the year and that the resort was paying all of its bills. The bank had not threatened to sue Cedar Shore for delinquent loan payments, nor had it instituted any collection proceedings against it. Geddes acknowledged that none of Cedar Shore's thirty-one other creditors had threatened any sort of litigation or collection actions against it. He also admitted that after filing its bankruptcy petition, the corporation had focused most of its efforts on "attempting to settle the Mueller claims in the confines of the bankruptcy estate" rather than on reorganizing its finances. The Muellers presented evidence that Cedar Shore's bankruptcy schedules failed to list and value properly all personal property and to account for approximately one million dollars in furnishings and equipment.

Cedar Shore presented witnesses who testified that the corporation had filed bankruptcy in order to protect its loan restructuring agreement with the bank, not to rid itself of the Mueller lawsuit. Geddes testified that the bank had indicated that it would not go through with the restructuring agreement unless it was confirmed by the bankruptcy court. According to bank officer Terry Johnson, Norwest feared that Cedar Shore shareholders would not make their required capital contributions if they were distracted by the lawsuit. Johnson testified that the bank wanted court approval of the restructuring agreement in order to ensure the shareholder payments, but he admitted that Norwest did not specifically require confirmation of the plan by the bankruptcy court.

After considering the evidence, the bankruptcy court found that Cedar Shore's primary motivation in filing Chapter 11 was to protect itself from the shareholder action

and dismissed its petition for bad faith under 11 U.S.C. § 1112(b).  The court found that although the resort had suffered numerous financial setbacks during its early years, its financial reports indicated that it "was doing better or at least was on the financial track originally projected towards making a profit in the year 2000."  The court found that Cedar Shore had a good working relationship with its bank, that the two parties had negotiated a mutually acceptable loan reorganization agreement, and that all other creditors were "apparently satisfied."  The court was not persuaded by Cedar Shore's claim that the bank needed court approval to protect the reorganization agreement since there was no evidence that the Mueller suit had jeopardized the agreement or that the shareholders would not have made their required capital contributions. The bankruptcy court also found that the petitioner's reorganization schedules did not accurately "list and properly value all personalty" and did not comport with either official forms or Bankruptcy Code requirements.  "The inaccurate and cursory nature" of these schedules indicated that Cedar Shore had filed bankruptcy in order to settle the Mueller lawsuit, not to effect a legitimate reorganization.   The court stated that one indicia of bad faith is when the petitioner's primary reason for filing bankruptcy  is to avoid a lawsuit.  It dismissed Cedar Shore's petition "in order to protect the jurisdictional integrity of the bankruptcy court and to prevent the misuse of the bankruptcy reorganization process."

Cedar Shore appealed the dismissal to the district court pursuant to 28 U.S.C. § 158.  The district court affirmed, after concluding that the bankruptcy court had not erred in finding that Cedar Shore filed its petition in bad faith and had not abused its discretion in dismissing the case.  The district court explained that "because the bankruptcy court permissibly found that Cedar Shore did not need [the] protections of bankruptcy to reorganize, but filed bankruptcy simply to settle the shareholder lawsuit, it did not err."  The court concluded that the fact that Cedar Shore had put forth a legitimate reorganization plan was not determinative.

Cedar Shore then filed this appeal, arguing that the bankruptcy court had erred 1) in finding that its petition was filed in bad faith, and 2) in dismissing its petition even though the resort was capable of proposing a confirmable reorganization plan. We affirm.

II.

This court sits as a second court of review on a bankruptcy matter, and we apply the same standards of review as the district court. See In re Clark, 223 F.3d 859, 862 (8th Cir. 2000). We review the bankruptcy court's factual findings for clear error and its conclusions of law de novo. Id. Whether a bankruptcy case has been filed in bad faith is a question of fact, and a dismissal will only be reversed if the court abused its broad discretion. See In re Lumber Exch. Bldg. Ltd. Partnership, 968 F.2d 647, 648 (8th Cir. 1992).

The purpose of Chapter 11 reorganization "is to restructure a business's finances so that it may continue to operate, provide its employees with jobs, pay its creditors, and produce a return for its stockholders." H.R. Rep. No. 595 (1975), *reprinted in* 1978 U.S.C.C.A.N. 6179. The Bankruptcy Code permits a court to dismiss a Chapter 11 petition for "cause." 11 U.S.C. § 1112(b). Section 1112(b) does not explicitly require that cases be filed in "good faith," but we have recognized that a bad faith filing can be cause for dismissal. See In re Kerr, 908 F.2d 400, 404 (8th Cir. 1990) (affirming dismissal of petition on grounds that violation of court orders, self-dealing, and evasive conduct indicated bad faith and "improper motive" in debtor's Chapter 11 filing). Other circuits have similarly held that the Code contains an implicit good faith requirement. See In re SGL Carbon Corp., 200 F.3d 154, 162 (3d Cir. 1999); In re Trident Assocs. Ltd. Partnership, 52 F.3d 127, 130-31 (6th Cir. 1995); In re Marsch, 36 F.3d 825, 828 (9th Cir. 1994); Carolin Corp v. Miller, 886 F.2d 693, 700 (4th Cir. 1989); In re Phoenix Piccadilly, Ltd., 849 F.2d 1393, 1394 (11th Cir. 1988); In re Little Creek Devel. Co., 779 F.2d 1068, 1071-72 (5th Cir. 1986). According to the Fifth Circuit, "[g]ood faith implies an honest intent and genuine desire on the part of the

petitioner to use the statutory process to effect a plan of reorganization and not merely as a device to serve some sinister or unworthy purpose." In re Metropolitan Realty Corp., 433 F.2d 676, 678 (5th Cir. 1971). The good faith requirement "is designed to prevent abuse of the bankruptcy process, or the rights of others, involving conduct or situations only peripherally related to the economic interplay between the debtor and the creditor community." L. King, 7 Collier on Bankruptcy, ¶ 1112.07[1] (2000) (citations omitted).

Cedar Shore argues that the bankruptcy court erred in finding that its Chapter 11 petition was filed in bad faith. There is no single test for determining when a debtor has filed in bad faith. Rather, courts consider the totality of the circumstances, including the court's evaluation of the debtor's financial condition, motives, and the local financial realities." Little Creek, 779 F.2d at 1072. The parties have not identified any case in this circuit which found bad faith by filing under Chapter 11 for the primary purpose of obtaining an advantage in litigation, but other courts have dismissed such cases on the grounds that this type of filing "is not within the legitimate scope of the bankruptcy laws." See In re SGL Carbon Corp., 200 F.3d 154, 165 (3d Cir. 1999) (citing cases).

The circumstances of SGL Carbon are similar to the case before us. The debtor there was a financially healthy company which filed bankruptcy in order to escape potentially crippling effects of a pending civil antitrust judgment against it. Id. at 166-67. The Third Circuit reversed the district court determination that "the distractions of litigation" constitute a valid reason for filing bankruptcy. The appellate court ruled that the debtor had filed in bad faith and dismissed the petition because Chapter 11 is intended for valid reorganization of "financially troubled businesses," not to permit financially solvent companies to "rapidly conclude litigation to enable a continuation of their business." Id. at 169.

Here, the bankruptcy court examined the evidence and found that Cedar Shore's primary motivation for filing bankruptcy was to dispose of the Mueller lawsuit. After carefully reviewing the record, we are satisfied that the bankruptcy court's findings are not clearly erroneous. There is strong evidence to support the finding that Cedar Shore did not file bankruptcy to effectuate a valid reorganization, but rather to prevent the Muellers from pursuing their claims in state court. The court was entitled to discount the testimony of those witnesses who stated that Cedar Shore's purpose in filing bankruptcy was to protect its loan restructure agreement with Norwest. See In re Roxy Real Estate Co., Inc., 170 B.R. 571, 573 (Bankr. E.D.Pa. 1993) ("[i]t is unlikely that a debtor will ever acknowledge its own bad faith") The parties did not need bankruptcy court approval of the loan agreement. There was no evidence that the bank might have been drawn into the Mueller lawsuit, or that the shareholders would not make their required capital contributions   In fact, the reorganization plan was substantially identical to the one reached by the parties in February 1998 before the bankruptcy filing. Cedar Shore was not in dire financial straits. The corporation had recently completed a favorable loan reorganization agreement with Norwest and did not have problems with any other creditors. Geddes had publicly declared that the business was doing well and that the corporation was poised to turn a profit in 2000. As recently as September 1997, the corporation had made the specific decision not to file for bankruptcy and it did not change course until it received notice of the Mueller lawsuit. Then the board voted to file for bankruptcy at the same meeting in which it discussed possible ramifications of the lawsuit. Moreover, Cedar Shore officers and directors were named defendants in the lawsuit and would therefore have had motivation to file corporate bankruptcy in order to settle the suit quickly. The Muellers' derivative claims were investigated in an admittedly cursory manner and were settled for a very low amount. Finally, the court could have found that the Cedar Shore attorney's unorthodox method of listing and valuing the resort property indicated that this was not a legitimate reorganization and that the company did not need to file bankruptcy in order to restructure its bank debt.

Cedar Shore also contends that because it had proposed a legitimate and confirmable reorganization plan, the bankruptcy court should not have dismissed its petition as a matter of law. The company asks us to adopt the test articulated by the Fourth Circuit in Carolin Corp. v. Miller, 886 F.2d 693, 700-01 (4th Cir. 1989). Carolin held that although a good faith filing requirement is implicit in the Code, a bankruptcy court cannot dismiss a petition for bad faith unless it also finds that no legitimate possibility of reorganization exists. Id. The underlying reasoning there was "that it is better to risk proceeding with a wrongly motivated invocation of Chapter 11 protections . . . than to risk cutting off even a remote chance that a reorganization effort so motivated might nevertheless yield a successful rehabilitation." Id. at 701. Although many courts cite Carolin for its holding that the Code contains an implicit good faith requirement, few courts outside the Fourth Circuit have adopted its rule that a case should not be dismissed where there is a chance of reorganization. But see In re Boynston, 184 B.R. 580, 583 (Bankr. S.D.Cal. 1995). Instead, many courts have held that bad faith alone is sufficient to warrant dismissal, regardless of the possibility of reorganization. See, e.g., Phoenix Piccadilly, 849 F.2d at 1393-94; In re ACI Sunbow, LLC, 206 B.R. 213, 217-21 (Bankr. S.D. Cal. 1997). The leading commentator in this area has stated that the Carolin rule "embraces some significant difficulties" and "misperceives the purpose of the good faith standard." See L. King, 7 Collier of Bankruptcy, ¶ 1112.07[6][a-b] (Eleventh Circuit's reasoning in Phoenix Piccadilly that "a court need not suffer the continuance of a bad faith chapter 11 case even if the debtor has a remote chance of rehabilitation is persuasive"). Under this view, "the taint of a petition filed in bad faith must naturally extend to any subsequent reorganization proposal," and "the possibility of a successful reorganization cannot transform a bad faith filing into one undertaken in good faith." Phoenix Piccadilly, 849 F.2d at 1395 (citations omitted).

This court has not yet had to address the issue of whether the possibility of a successful reorganization precludes dismissal even if a debtor has filed in bad faith. See Kerr, 908 F.2d at 404, fn. 10. After considering the purposes and policies

underlying the Bankruptcy Code, we decline to adopt the <u>Carolin</u> test and hold that a Chapter 11 petition may be dismissed for bad faith alone where the circumstances warrant. We believe that such a rule protects the integrity of the bankruptcy courts by limiting the availability of their "powerful equitable weapons" to parties filing in good faith. <u>In re Little Creek Devel. Co.</u>, 779 F.2d 1068, 1072 (5th Cir. 1986). Debtors seeking the protection of the Code should act in conformity with the Code's underlying principles of equity and fairness, and any debtor who files bankruptcy in bad faith should not be permitted to enjoy the protections of Chapter 11, even though the debtor might be capable of effectuating a reorganization. Moreover, as the district court noted, § 1112(b) already permits "dismissal based on the lack of any realistic possibility of confirming a plan of reorganization, without any additional finding of bad faith." Requiring objective futility in addition to bad faith would render "the good faith doctrine a useless appendage to the statutory grounds listed in § 1112(b)." Consequently, we hold that the bankruptcy court did not err in its legal conclusion that it had authority to dismiss a petition filed in bad faith.

Nor did the bankruptcy court abuse its discretion in dismissing Cedar Shore's petition. Congress designed Chapter 11 to give those businesses "teetering on the verge of a fatal financial plummet an opportunity to reorganize on solid ground and try again, not to give profitable enterprises an opportunity to evade contractual or other liability." <u>Furness v. Lilienfield</u>, 35 B.R. 1006, 1009 (D.Md. 1983). The record supports a finding that Cedar Shore's purpose in filing bankruptcy was to thwart the Mueller lawsuit, not to attempt "to reorganize on solid ground and try again." Because the "powerful equitable weapons" of the bankruptcy court should be "available only to those debtors . . . with 'clean hands'" and not to those debtors "whose overriding motive is to delay creditors without benefitting them in any way or to achieve reprehensible purposes," the bankruptcy court did not abuse its discretion in dismissing the case. <u>In re Little Creek</u>, 779 F.2d at 1072.

Finally, Cedar Shore argues that "a case which is a two party dispute may only be dismissed as lacking good faith if it is incapable of prompt resolution." It cites In re Hatcher, 218 B.R. 448 (8th Cir. B.A.P. 1998), for this proposition, and claims that the bankruptcy court erred in dismissing the case "even though it made no finding that the litigation was capable of prompt resolution." This argument is unpersuasive. First, the bankruptcy court did not base its dismissal upon a finding that the parties were involved in a two party dispute, but indicated that this circumstance existed in addition to others indicating bad faith. Second, Cedar Shore misstates the effect of Hatcher, which merely noted that a finding that a dispute is not capable of prompt resolution might indicate bad faith. It did not require such a finding before dismissal for bad faith is warranted. The bankruptcy court did not abuse its discretion by dismissing this case.

III.

Since the bankruptcy court did not clearly err in finding that Cedar Shore filed bankruptcy in bad faith and the court did not abuse its discretion in dismissing the debtor's petition for that reason, we affirm the judgment.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-11-